[Cite as *State v. Lute*, 2016-Ohio-7978.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | Case No. 15CA3715 |
| v. | : | |
| | | <u>DECISION AND</u> |
| TIMOTHY W. LUTE, | : | <u>JUDGMENT ENTRY</u> |
| Defendant-Appellant. | : | RELEASED 11/28/2016 |

<u>APPEARANCES</u>:

Robert W. Bright, Middleport, Ohio, for defendant-appellant Timothy W. Lute.

Mark E. Kuhn, Scioto County Prosecuting Attorney, and Jay Willis, Scioto County Assistant Prosecuting Attorney, Portsmouth, Ohio, for plaintiff-appellee State of Ohio.

Hoover, J.

{¶1} This is an appeal from a judgment of conviction and sentence entered by the Scioto County Court of Common Pleas following a jury trial at which Timothy W. Lute ("Lute"), appellant herein, was found guilty of one count of rape, one count of kidnaping, and one count of having a weapon under a disability. On appeal, Lute contends that he received ineffective assistance from his trial counsel; that there were irregularities in the trial that prevented him from receiving a fair trial; and that his convictions should be overturned because of inconsistencies in the jury's verdicts, jury instruction(s), and the factual testimony. Having reviewed the record, we find merit to Lute's assertion that he was improperly prohibited from testifying in his own defense. We further conclude that the error was not harmless. Accordingly, we reverse the judgment of the trial court and remand this matter for further proceedings.

**I. Facts and Procedural History**

{¶2}    Lute was indicted on five counts: (1) rape with a firearm specification and a sexually violent predator specification; (2) kidnapping with a firearm specification; (3) kidnapping with a firearm specification, sexual motivation specification, and sexually violent predator specification; (4) felonious assault with a firearm specification and a sexually violent predator specification; and (5) having a weapon while under a disability.

{¶3}    After initial concerns regarding Lute's competency, the matter proceeded to trial. The first trial resulted in a hung jury and a mistrial. Notably, Lute testified in his own defense at the first trial. The State elected to proceed with a second trial. Lute did not testify at the second trial.[1] The following factual account is fashioned from the evidence of the second trial.

{¶4}    In 2005, Lute met the victim at a party being held at Lute's father's house; and within a couple of months the two were living together. Over the next 10 years the couple had two children and continued living together. The two never married; however, they shared expenses and had a joint bank account.

{¶5}    The victim testified that she and Lute began having problems in their relationship near the beginning of 2014. In November 2014, the victim started attending church, which further upset Lute. According to the victim, Lute did not approve of her attending church.

{¶6}    By December 17, 2014, the relationship deteriorated to the point that the victim informed Lute via text message that she wanted to terminate the relationship and leave the shared residence. However, the victim agreed to stay in the shared residence until after Christmas so that the holiday would not be ruined for their children.

---

[1] Different counsel represented Lute in the two trials.

{¶7}  Despite her desire to terminate the relationship and leave the residence, the victim testified that she had sex with Lute on Christmas Day. She claimed that she had sex with Lute because she was afraid of him. The victim continued to live with Lute up through December 30, 2014.

{¶8}  The victim testified that on December 30, 2014, her children stayed the night at her parent's residence while she worked the night shift at her place of employment. On New Year's Eve afternoon, the victim drove to Lute's residence to retrieve her clothes and the children's clothes. She testified that when she first entered the residence she did not see Lute. While inside the residence she heard the backdoor shut and walked out to the dining room. While in the dining room she encountered Lute who pointed a 30/30 rifle at her and threatened her life. The victim testified that Lute eventually ordered her to get into her car. According to the victim, Lute held the gun to her side and ordered her to drive to a remote wooded location near McDermott, Ohio. Once they arrived to the location, Lute ordered the victim out of the car. According to the victim, Lute continued to point the gun at her and ordered her to walk through a field.

{¶9}  After walking through the field, into the woods, and up a hillside, the victim testified that Lute instructed her to sit down so he could smoke a cigarette. Lute then ordered her to walk farther up the hillside. She testified that they finally stopped where a tree had fallen to the ground, and that Lute laid the gun down, took his coat off, and put it on the ground. The victim stated that Lute then ordered her to take her pants off and lay on the coat. According to the victim, Lute then pulled his pants down, picked the gun back up, got on top of her, and had sexual intercourse with her. The victim stated that during the sexual act Lute had the rifle in his right hand while using his left hand to support himself.

{¶10}   The victim testified that Lute then got up, laid the gun down, got dressed, assisted her in getting up and dressed, and then told her he loved her too much to hurt her and that he was going to let her go. Lute and the victim then walked back to the car; and Lute told the victim that he wanted her to take him to his brother's house, because he was going to kill himself; and he wanted to say goodbye. When they got back into the car, Lute again pointed the gun to the victim's side.

{¶11}   The victim testified that she drove Lute to his brother's house, they talked briefly with Lute's brother, and then Lute told her to get back in the car and drive him to Tatman Coe Road. The victim drove Lute to this location; and he walked away from the car.

{¶12}   The victim testified that she immediately drove towards her mother's house until she got cellular service and called 911. Later that evening, after giving a statement to law enforcement, she went to Adena Hospital for completion of a rape kit examination.

{¶13}   During the victim's testimony, it was also revealed that she had met another man while attending church in November 2014. According to the victim, she and the man had exchanged between 20 and 40 text messages from the time they met at church in November 2014 until New Year's Eve 2014. The two entered a romantic relationship in February 2015; and eventually they got married on September 3, 2015.

{¶14}   During a break at trial, and while the victim was still on the stand, defense counsel served the victim with a subpoena duces tecum requesting her cell phone and cell phone records. The State objected to the subpoena, and after some discussion it was determined that the victim did not have the cell phone she had during the time of the alleged incident or her cell phone records. Thus, the victim was not required to answer the subpoena. However, when the

trial resumed, defense counsel was permitted to question the victim regarding the content of the text messages.

{¶15}  Several other witnesses testified during the State's case, including law enforcement officers. Among other things, the State's evidence established that it was between 19 and 38 degrees Fahrenheit on the date of the alleged incident; that DNA testing of a vaginal swab from the victim taken on the date of the incident revealed the presence of Lute's semen; that DNA testing of the coat allegedly worn by Lute on the date of the incident revealed the presence of Lute's semen and the victim's DNA; and that Lute had a prior conviction from 2002 for attempted abduction, a violent offense placing him under disability from owning firearms. The defense offered the testimony of Paul Thompson in its case, and then rested. Thompson, Lute's cousin, testified that he visited Lute on the evening of the alleged incident at Lute's home, and later that same evening at a party at a mutual friend's house. As mentioned above, Lute did not testify at the second trial.

{¶16}  At the conclusion of trial, the jury returned guilty verdicts on the rape count, the first kidnapping count, and the having a weapon under a disability count. The jury returned not guilty verdicts on the felonious assault count and the second kidnapping count; and also found Lute not guilty of the firearm specifications related to the rape and kidnapping counts. The trial court entered judgment on the verdicts and sentenced Lute to an aggregate and mandatory 10-year term of imprisonment. Lute is also classified as a Tier III sex offender as a result of the convictions. This appeal followed.

## II. Assignments of Error

{¶17}  On appeal, Lute assigns the following errors for our review:

Assignment of Error I:

THE APPELLANT'S CONVICTIONS SHOULD BE OVERTURNED BECAUSE APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE TRIAL COURT LEVEL AND THERE WERE SIGNIFICANT IRREGULARITIES IN THE TRIAL IN THE FORM OF INAPPROPRIATE AND/OR INADMISSIBLE TESTIMONY.

Assignment of Error II:

THE APPELLANT'S CONVICTIONS SHOULD BE OVERTURNED BECAUSE OF INCONSISTENCIES IN THE JURY'S VERDICTS, JURY INSTRUCTION(S), AND IN THE FACTUAL TESTIMONY.

Assignment of Error III:

ADDITIONAL ISSUES THAT APPELLANT WANTS RAISED BUT FOR WHICH APPELLANT'S COUNSEL BELIEVES THERE IS NOT SUFFICIENT BASIS IN LAW OR FACT TO RAISE.

### III. Law and Analysis

{¶18}  In his first assignment of error, Lute contends that his trial counsel rendered ineffective assistance, and that irregularities in the trial prevented him from receiving a fair trial. As part of his "irregularities" argument, Lute argues that he "wanted to present additional evidence in support of his case", "including testifying himself", but that he "did not have the opportunity to present that additional evidence."

{¶19}  A defendant in a criminal case has the due process right to take the witness stand and to testify in his or her own defense. *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The right to testify and to present a complete defense also may implicate the Confrontation Clause of the Sixth Amendment. *See Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). "Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right." *Brooks v. Tennessee*, 406 U.S. 605, 612, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972).

{¶20} A defendant's right to testify is not without limitation, however, and " 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' * * * But restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." *Rock* at 55-56, quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

{¶21} A trial court has authority to exercise reasonable control over the mode and order of presenting evidence in order to insure that the proceedings are effective for the ascertainment of the truth. Evid.R. 611(A). Therefore, a trial court possesses some discretion in ruling on a party's motion to reopen their case and to present evidence out of its normal order. *Columbus v. Gant*, 1 Ohio App.3d 96, 97, 439 N.E.2d 907 (10th Dist.1981); *State v. McMahon*, 4th Dist. Scioto No. 92CA2075, 1993 WL 120635, *2 (Apr. 14, 1993). In exercising its discretionary power in this regard, however, a trial court must give due consideration to the defendant's constitutional right to due process. *Rock* at 49; *State v. Sinkfield*, 2d Dist. Montgomery No. 13180, 1993 WL 339298, *6-7 (Sept. 1, 1993).

{¶22} In the case sub judice, after both sides had rested their respective cases, and after a brief recess, the trial court brought the jury into the courtroom for closing arguments. Lute's attorney had presented Thompson as a witness, but rested his case without calling Lute to the stand. Lute remained silent at that point and had not asked the court to permit him to testify. However, in the presence of the jury, and immediately before the prosecutor began his closing argument, the following exchange occurred between Lute and the trial court:

DEFENDANT: Well, Your Honor, can I speak?

THE COURT: No, sir, you chose not to testify.

MR. MEARAN [defense counsel]: Your Honor, we're prepared to – final argument. Just – just have a seat, Tim, please.

DEFENDANT: I got all this stuff to show the jurors.

MR. MEARAN: Just please sit down.

DEFENDANT: That never got showed this trial and it didn't get showed in the last one, the mistrial.

MR. MEARAN: Oh, that's fine.

DEFENDANT: This would help me.

MR. WILLIS [assistant prosecutor]: Your Honor, can we approach?

THE COURT: Yes.

DEFENDANT: I don't know why they don't want them to know there was a mistrial in June.

BAILIFF BRYANT: Hold on, Mr. Lute, they're approaching the bench.

THE COURT: Sir, anymore comments out of you and you'll be in contempt.

**(BENCH CONFERENCE)**

MR. TIEMAN [assistant prosecutor]: What's the procedure when he blows up? Do we remove him from the courtroom and go without him?

MR. WILLIS: We've got – we've got a disruptive Defendant.

THE COURT: Well, --

MR. WILLIS: I've got a bench brief on it. We can kick him out of here.

THE COURT: I know. And you – you – if you explain to him one more outburst, he's out of the courtroom.

MR. WILLIS: He['s] setting it up for a mistrial and it's at his doing, not ours.

THE COURT: Right.

**(END OF BENCH CONFERENCE)**

MR. MEARAN: Tim, just don't do this. Okay. Please. Let me talk. Let me talk.

THE COURT: Okay. The State of Ohio ready to give closing arguments?

Mr. TIEMAN: Yes, Your Honor.

{¶23} The State then presented their closing argument. Immediately following the State's closing argument Lute again interposed and the following exchange occurred:

THE COURT: Thank you, Mr. Tieman. Mr. Mearan.

MR. MEARAN: Thank you.

DEFENDANT: Your Honor, I'm ready to go back to the jail. There's a lot of things here I wanted the jurors to see.

THE COURT: Sir, sit down.

BAILIFF BRYANT: Sit down, Tim.

DEFENDANT: It's just not a fair trial to me. There's a lot of things here. I wanted to take the stand, but they will not let me.

MR. TIEMAN: Your Honor, we prefer he should be escorted out of the courtroom at this time.

DEFENDANT: Why?

THE COURT: If you say one more word I'm going to have to escort you out of the courtroom.

DEFENDANT: Okay. We're on a mistrial here. This is the second time.

BAILIFF BRYANT: Sit. Sit down. Sit down.

DEFENDANT: But there's things I want to show the jurors can't see, because they won't show them.

THE COURT: Sir.

MR. TIEMAN: Your Honor, if he's going to continue to do this –

THE COURT: You're rested.

DEFENDANT: Well, you know. You wouldn't show them the last time.

MR. TIEMAN: Your Honor, he's trying to taint the jury.

DEFENDANT: No, I'm not. I'm telling the truth.

THE COURT: Sir, no more. Proceed.

DEFENDANT: Crawford, take me back, will you? I'm not getting a fair trial here.

BAILIFF BRYANT: Just let your attorney do his job, Tim.

DEFENDANT: Mike, I'm done. There's a lot of things here you wouldn't show. You're my attorney, you're supposed to.

MR. TIEMAN: Your Honor, we'd ask that he be removed from the courtroom.

THE COURT: One more word you're out of the courtroom.

DEFENDANT: Okay. I'm ready.

THE COURT: Okay. Take him down to the law library.

DEFENDANT: Your Honor, this is not a fair trial. I want this on record. Oh, you don't have to escort me. I'm fine.

MR. WILLIS: Your Honor, for the record can we approach the bench?

THE COURT: Yes, you may.

**(BENCH CONFERENCE)**

MR. WILLIS: Your Honor, for the record, pursuant to Criminal Rule 43(B), the Defendant may be excluded because of disruptive conduct. I believe that's what we have here today. I think you've made the proper findings. If there's any other findings you want to make on the record, you can certainly do so, but I think it's well under the Court's prerogative to do what was just done, and I think the

record is protected as far as that goes. We have a bench brief to that affect. If Mr.

Mearan has anything to say, he can certainly do so.

MR. MEARAN: I would like the jury instructed that the fact that he left has no

bearing and should not be considered in deliberations.

THE COURT: Okay. I can do that.

MR. WILLIS: And I think that's appropriate. I think the case law provides for that

and says that that's what should be done, and that's – and that's fine.

THE COURT: Okay.

**(END OF BENCH CONFERENCE)**

{¶24}   Thereafter, the trial court instructed the jury that Lute's absence should have no

bearing on deciding the case; and defense counsel and the State proceeded to give closing and

rebuttal arguments in Lute's absence. Following the conclusion of arguments, the trial court

excused the jury for the day and noted that final instructions and deliberations would take place

the following morning. The jury then left for the day and Lute was brought back into the

courtroom. Once back in the courtroom, the following colloquy took place:

THE COURT: Mr. Lute, I'm going to be charging the jury tomorrow with my

final instructions of law. I'm going to give you one opportunity if you'll give me

your word that you'll make no more outbursts I'll let you stay in the courtroom.

DEFENDANT: All I ask for, You Honor is a fair trial.

THE COURT: Sir, I have followed the instructions of – of law right down to the wire.

DEFENDANT: Well, a lot of things didn't get shown.

THE COURT: I can't help what – who – you and your attorney agree to do. This is not my idea to present – my job to present your case. Okay.

DEFENDANT: Um hmm.

THE COURT: You and Mr. Mearan obviously had a strategy. Apparently, you don't agree with the strategy now, but you're not going to make outburst in my courtroom. And if you do make anymore outburst then I'll have you taken back out. Now are you giving me your word?

DEFENDANT: Yes, Your Honor.

THE COURT: Okay. You'll be in the courtroom.

MR. MEARAN: Your Honor, to – for purposes of appeal, I would like to have him put on the record what evidence wasn't presented in his behalf, because if there's – if there's something – I mean, we went – I would submit that we went over the questions that he had written down. They were all things that we either covered or gave her an opportunity to explain. The fact that – where the guns were are – is irrelevant. The evidence – the only evidence is was – did you have a gun that day, not whether they were here, or whether they were there. It's – I would submit that – that from a legal standpoint – and it's hard sometimes for a defendant to understand that, or to say, well, I wanted to this or I wanted to do

that, that we have presented all the evidence necessary in this case to corroborate. Mr. Thompson testified as to what happened. Any other evidence presented would open the door for the State to present additional evidence that would be detrimental to you. Now I've tried the case as best as I can. I presented the case and all the evidence that should be in. He wanted a – text messages about where the guns were or what the guns were. I submit they have nothing to do with the 30/30 gun that is the subject matter of this case, that no one saw except the victim.

DEFENDANT: I said I wanted to take the stand too, Mike. I changed my mind. I wanted to give my testimony.

MR. MEARAN: Well, that was done after I rested. We discussed this about taking the stand and you agreed you didn't want to take the stand.

DEFENDANT: That was yesterday.

THE COURT: Once – once you rest, sir, you rested. Now you're not getting the opportunity to take the witness stand.

DEFENDANT: But before we rested, Your Honor, I said I wanted to give my testimony because at least I would have had a chance to present on the projector to the jurors what I wanted to show them. And I mean, it didn't get shown the last trial and it didn't get shown this trial, so that tells me right there that's not good for me, because that would have helped me. That's all I'm trying to say.

THE COURT: Mr. Mearan, did you ask your client whether he wanted to take the stand or not?

MR. MEARAN: Yes.

THE COURT: Was that right before you rested?

MR. MEARAN: We discussed it yesterday. He did not tell me he wanted to take the stand until after.

DEFENDANT: I did, Mike. You must not have heard, but I told you I was going to get up there. I mean, I ain't got no chance. I mean, me sitting here. I got up there the last time. Why wouldn't I get up there this time?

MR. MEARAN: Because the last time they opened the door to your being revoked in front of Judge Harcha. It opened the door to – that you called – it had no benefit. Your testifying –

DEFENDANT: They asked me and I told them what happened.

MR. MEARAN: Okay.

DEFENDANT: That's all that happened, Mike. I mean, what was I going to do, set there and lie. I just said what happened. They asked me, I told them.

* * *

MR. MEARAN: That has nothing to do – Your Honor, I have presented the case.

DEFENDANT: Your Honor, I'm sorry, I'm ready to go back to the jail, but I did not get a fair trial. They was a lot of things that I asked to get and I didn't get.

* * *

THE COURT: Well, Mr. Mearan's a fine attorney.

DEFENDANT: I know he is, but that is a –

THE COURT: I understand you chose –

DEFENDANT: -- a big misunderstanding and a lot of things that we didn't have

time to go through together. Mike's busy. He's the only one that I ever see on

Sunday's in that jail.

\* \* \*

{¶25}   This Court, in *State v. Skeens*, 4th Dist. Lawrence No. 95CA24, 1997 WL

243488, \*5 (May 6, 1997), has previously determined that a criminal defendant has the right to

reopen his or her case after the conclusion of testimony in order to testify on their own behalf. In

*Skeens*, after the parties had rested their respective cases, but prior to the commencement of

closing arguments, the defendant requested the opportunity to testify on his own behalf. *Id*. at \*4-

5. The trial court denied the defendant's request. *Id*. at \*5. On appeal, we found that the trial

court's denial of the right to testify affected a fundamental constitutional interest, explaining as

follows:

We recognize the need for the trial judge to maintain control over the order of

presenting evidence and to bring the trial to a timely conclusion. However, this

administrative efficiency must be balanced against a defendant's substantive right

to testify if he or she so chooses. Here, the appellant's delay in exercising this

right until closing argument did not constitute such an infringement upon the

orderly sequence of the trial as to justify denying him a chance to testify. Granted,

the delay in asserting the right to testify may have inconvenienced the court by

requiring reopening of the case and possibly necessitating a revision of the jury

instructions. Yet because the case had not yet been presented to the jury for its

deliberation, we believe the appellant's right to full access to the courts required

expeditiousness to take a back seat to the exercise of his substantive right to

testify.

*Id.*

{¶26}  The facts of the instant case are eerily similar to those of *Skeens*. Here, Lute did

not state a desire to testify until after both parties had rested their case. However, his request was

made prior to the giving of final jury instructions and prior to jury deliberations. Like we

previously decided in *Skeens*, we believe that the trial court's need to maintain control over the

order of presenting evidence and to bring the trial to a timely conclusion is outweighed by a

defendant's substantive right to testify if he or she so chooses. Thus, under the facts of this case,

we conclude that the trial court's denial of Lute's right to testify affected a fundamental

constitutional interest. In reaching this conclusion, we recognize that contrary authority exists on

this issue. *See, e.g., United States v. Jones*, 880 F.2d 55 (8th Cir.1989) (a trial court's refusal to

permit testimony by the defendant once the proofs have been closed did not unconstitutionally

infringe on the defendant's right to testify). However principles of stare decisis require that we

follow our prior holding in *Skeens* unless there is a "special justification" to depart from it. *See*

*Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003–Ohio–5849, 797 N.E.2d 1256, ¶¶ 1, 44

("Stare decisis is the bedrock of the American judicial system. Well-reasoned opinions become

controlling precedent, thus creating stability and predictability in our legal system. It is only with

great solemnity and with the assurance that the newly chosen course for the law is a significant

improvement over the current course that we should depart from precedent."). In *State v. Certain,* 180 Ohio App.3d 457, 2009–Ohio–148, 905 N.E.2d 1259, ¶ 10 (4th Dist.) we explained:

> "[A]n appellate court 'not only has the right, but is entrusted with the duty to examine its former decisions and, when reconciliation is impossible, to discard its former errors.' " *State v. Burton,* Franklin App. No. 06AP–690, 2007–Ohio–1941, 2007 WL 1196579, at ¶ 22, quoting *Galatis* at ¶ 44. However, " 'any departure from the doctrine of stare decisis demands special justification.' " *Galatis* at ¶ 44, quoting *Wampler v. Higgins* (2001), 93 Ohio St.3d 111, 120, 752 N.E.2d 962. The Supreme Court defined what constitutes "special justification" in its decision in *Galatis:* "[I]n Ohio, a prior decision of the Supreme Court may be overruled where (1) the decision was wrongly decided at that time, or changes in circumstances no longer justify continued adherence to the decision, (2) the decision defies practical workability, and (3) abandoning the precedent would not create an undue hardship for those who have relied upon it." *Id.* at ¶ 48; see also *State v. Mathis,* 109 Ohio St.3d 54, 2006–Ohio–855, 846 N.E.2d 1, fn. 7 (noting that courts must adhere to prior precedent unless the *Galatis* elements have been satisfied); *Burton* at ¶ 22 (applying the *Galatis* test).

{¶27}  Here, there is insufficient justification to overrule *Skeens.* First, we cannot definitively conclude that *Skeens* was incorrectly decided. Rather, the *Skeens* opinion was well reasoned and based upon principles enumerated by the United States Supreme Court in *Rock*, *supra*. Furthermore, we cannot say that *Skeens* "defies practical workability." As discussed

above, any inconvenience caused by the late request to testify, i.e. reopening the case and adjusting final jury instructions, does not justify denying the defendant a chance to testify.

{¶28} Having concluded that there was constitutional error in the denial of Lute's request to testify, we must also determine whether such error was harmless. *See Skeens*, *supra* at *5-6, and *Solomon v. Curtis*, 21 Fed.Appx. 360, 362-363 (6th Cir.2001) (both concluding that denial of the right to testify at the late stages of the proceedings is not structural error, but rather is subject to harmless error analysis).

{¶29} Crim.R. 52(A) defines harmless error and provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." To determine whether substantial rights were affected, a court must evaluate prejudice to the defendant. *State v. Morris,* 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶¶ 23, 27. Courts are to focus on the impact the error had on the verdict and the strength of the remaining evidence. *Id.* at ¶ 25.

{¶30} In *Skeens*, although this Court found that the trial court's denial of the due process right to testify affected a fundamental constitutional right, this Court nonetheless affirmed the decision of the trial court because the error was harmless beyond a reasonable doubt. Despite the strikingly similar aspects of *Skeens* with the case sub judice, this case is unique in that Lute did testify at his first trial, and the transcript of the testimony is a part of the record on appeal. In the first trial, Lute admitted to having sex with the victim in the woods, but claimed that the sex was consensual. He also denied removing the victim against her will, and denied that he possessed a firearm on the date of the alleged incident. Lute's version of events would explain why his semen was found on the vaginal swab of the victim and on the jacket he was alleged to have been wearing on the date of the incident.

{¶31}  Furthermore, the jury in Lute's first trial was able to hear his testimony, and that trial ended with a hung jury and mistrial. Thus, it would appear that the error in denying Lute's testimony in the second trial had, or potentially had, some impact on the jury. In addition, the remaining evidence of the case rests almost entirely on the victim's testimony and version of events. Without Lute's version of events, the victim's uncontroverted testimony would certainly be sufficient to support the verdicts. However, as demonstrated by the first hung jury and mistrial of this case, when viewed against Lute's version of events, the remaining evidence may not appear to be overwhelming to a jury.

{¶32}  Given the circumstances of this case—especially the fact that the first trial in which Lute testified resulted in a hung jury and a mistrial—the denial of Lute's right to testify did affect his substantial rights. Accordingly, after reviewing the entire record, we cannot conclude that the trial court's error in denying Lute the right to testify was harmless beyond a reasonable doubt. This decision is not a comment in support of either Lute's or the State's version of facts; rather, this decision is written to preserve the right to testify in one's defense as a fundamental constitutional right.

## IV. Conclusion

{¶33}  Based upon the foregoing reasons, we sustain Lute's first assignment of error in part. Our resolution of Lute's denial to testify argument is dispositive, and renders moot his remaining arguments. Hence, we need not address the remainder of the arguments under Lute's first assignment of error, or the arguments under his second and third assignments of error. *See* App.R. 12(A)(1)(c).

{¶34}  Accordingly, the judgment of the trial court is reversed; and this matter is

remanded for further proceedings consistent with this opinion.

JUDGMENT REVERSED AND CAUSE REMANDED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS REVERSED and that the CAUSE BE REMANDED for further proceedings consistent with this opinion. Appellee shall pay the costs.

The Court finds that reasonable grounds existed for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J.: Concurs in Judgment and Opinion.
McFarland, J.: Dissents.

For the Court

BY:  _____
         Marie Hoover, Judge

**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**