[Cite as *State v. Phillips*, 2025-Ohio-4555.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 23AP-582 |
| v. | : | (C.P.C. No. 21CR-2357) |
| Antoine D. Phillips, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 30, 2025

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Carpenter Lipps LLP*, *Kort Gatterdam*, and *Michael Rogers*, for appellant. **Argued:** *Kort Gatterdam.*

APPEAL from the Franklin County Court of Common Pleas

BOGGS, J.

{¶ 1} Defendant-appellant, Antoine D. Phillips, appeals a judgment of conviction and sentence for felony murder and kidnapping, following a jury trial in the Franklin County Court of Common Pleas. For the following reasons, we affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} Phillips was indicted in June 2021 for felony murder in violation of R.C. 2903.02, kidnapping in violation of R.C. 2905.01, and domestic violence in violation of R.C. 2919.25, all arising out of activity that occurred on May 18, 2021, near the intersection of Morse Road and Westerville Road in Franklin County. The victim named in each count of the indictment is J.F., with whom Phillips had been in a romantic relationship for about two years. Phillips's first trial ended in a mistrial.

{¶ 3} A second trial commenced on August 14, 2023. The state's theory of the case was that Phillips chased J.F. across Westerville Road, knocked her to the ground, struck her repeatedly, dragged her back into the middle of the street, continued to strike her, and then left her in the street, where she was run over by multiple vehicles, as Phillips walked away. The state presented testimony from eight witnesses.

**A. The state's evidence**

{¶ 4} Before calling witnesses with knowledge of the events that occurred on May 18, 2021, the state first called J.F.'s father, who described J.F.'s relationship with Phillips and J.F.'s struggles with drug addiction.

{¶ 5} The state's next witnesses were present at or near the scene of J.F.'s death, at or just after the time of the events that formed the basis for the alleged offenses. Stefanie Reed was driving northbound on Westerville Road, just north of Morse Road, around midnight on May 18, 2021, when the car in front of her stopped. Reed observed a woman, being chased by a man, run past and behind her car into a parking lot, where the man grabbed her. Reed stated it looked like the man was going to swing on the woman. Reed could hear the man and woman yelling at each other, but she could not make out what they were saying. Once they were off the road, Reed "took off" and called 911 to report a couple arguing in the street.

{¶ 6} Ethan Friend was driving southbound on Westerville Road around midnight on May 18, 2021. As he passed a car that had stopped in the right-hand lane, Friend hit what he thought was a bad pothole. He testified, "as I was going through the [Morse Road] intersection, my car just stopped being able to accelerate, so I scooted into the Circle K, parked and got out." *Id.* at 269. He called 911 after seeing what he later learned to be human remains on his vehicle.

{¶ 7} Shortly before midnight on May 18, 2021, Philip Booth was driving south on Westerville Road toward Morse Road when he saw in his headlights a body lying face down in the road; before he could react, he drove over the body. Booth pulled into the Speedway gas station on the northwest corner of Morse and Westerville Roads and called 911. He testified that the police arrived within minutes of his call. According to Booth, at least one other person who hit the body also pulled into the Speedway parking lot.

{¶ 8} Rachel Otis, who lives at the intersection of Westerville Road and Bennington Avenue, just north of Morse Road, was awakened on May 18, 2021 by people arguing on Westerville Road. She heard a man say, "You need to quit or I'm going to put my hands on you." *Id.* at 306; *see also, id.* at 319-320. When she then heard a woman screaming " 'Help me,' " Otis and one of her sons went onto her back deck to see what was happening. *Id.* at 301. Otis saw a male silhouette through her fence and heard a male voice whisper, " 'Babe, babe.' " *Id.* Within a few minutes, Otis heard what she thought was a car crash. Otis and her son ran through the house and, joined by another of her sons, exited the front door toward the corner, to see where the crash was. Otis could only see some debris on Westerville Road. She later clarified that the "debris" was a "body that was getting run over." She claimed at least ten cars ran over the body. Otis (or her son) called 911.

{¶ 9} Lieutenant Joshua Retherford, then a Detective with the Blendon Township Police Department, responded to the scene of these events at approximately 2:30 a.m. on March 19, 2021. By the time he arrived, other law-enforcement personnel had completely closed the road, marked the area with crime scene tape, and covered a body lying in the street with a white sheet. Lt. Retherford obtained video surveillance from a used automobile dealership on Westerville Road, between Morse Road and Bennington Avenue, which was played for the jury. The surveillance video presents an east-facing view, across Westerville Road from the auto dealership. Over objection, Lt. Retherford stated that the video shows "two individuals, one running from another," and "someone being beat up and laid in the middle of the roadway." (Aug. 17, 2023 Tr. Vol. 3 at 335.)

{¶ 10} There was a preliminary identification of the victim at the scene, and the coroner's office later fully identified the victim as J.F. Based on the information he gathered at the scene, Lt. Retherford determined Phillips to be a suspect. At some point, Lt. Retherford spoke with Phillips's mother, who resided on Bennington Road, five or six houses from Westerville Road.

{¶ 11} Lt. Retherford filed a warrant for Phillips's arrest, but he was unable to interview Phillips until June 1, 2021. A redacted body-cam video of that interview was played for the jury. During his interview with Lt. Retherford, Phillips confirmed that he and J.F. were the individuals visible in a photograph from surveillance video taken at the

Speedway station and in surveillance video from the used automobile dealership located north of the Speedway on Westerville Road.

{¶ 12} Phillips initially told Lt. Retherford that he left J.F. at the Speedway station and walked to his mother's house. He indicated that J.F. had threatened to commit suicide and had walked into the street that evening and that he had begged her to get out of the street before he walked away. When confronted with the surveillance video, Phillips acknowledged that he and J.F. remained together after he walked north from the Speedway station. Phillips denied hitting J.F. or dragging her into the road, denied that J.F. screamed for help, and stated that the surveillance video simply showed him grabbing J.F.'s bag. He claimed that J.F. was in the street, trying to commit suicide, and that he was trying to protect her by waving at cars to get out of the way. Phillips told Lt. Retherford that his intention was to take J.F.'s bag to retrieve his belongings from it. The surveillance video unequivocally shows Phillips walking away from J.F.'s unmoving body in the southbound lanes of Westerville Road, where she remained for about 90 seconds until she was hit the first time. Phillips denied hearing a crash. He claimed he first learned that J.F. had been run over the next morning.

{¶ 13} Special Agent Chad Holcomb of the Ohio Bureau of Criminal Investigation began processing the scene around 3:30 a.m. He took photographs of the scene, including several vehicles that had run over J.F.'s body, and he collected evidence, including J.F.'s personal belongings. He created a diagram identifying the approximate place where J.F. was initially struck and where her body ultimately came to rest, 1010 feet away, based on bloodstains on the road. Holcomb remembered this case because of how gruesome it was.

{¶ 14} The state's final witness was Dr. Maneesha Pandey, an employee of the Franklin County Forensic Science Center, who performed an autopsy on J.F. on May 20, 2021. Dr. Pandey determined the cause of J.F.'s death was multiple blunt force trauma and that the manner of death was homicide. Dr. Pandey relied on investigative information supplied by Blendon Township in determining homicide as the manner of J.F.'s death. As part of her testimony, Dr. Pandey identified 11 photographs taken at the time of J.F.'s autopsy.

## B. Discussion of Phillips's right to testify

{¶ 15} After the state rested its case, the trial court addressed Phillips about "one of the questions [he] had about taking the stand." Tr. Vol. 3 at 481. At the outset, the court advised Phillips of both his "constitutional right to remain silent" and his "constitutional right to defend [him]self and testify." *Id.* at 482. The court continued:

> But you got to understand a few things, once you opt to testify, once you get on that stand, you can't call a time out, I don't want to testify anymore, you're stuck. Okay. So if it's getting bad up there for you, you can't just say, no, no, no, I don't want to deal with it anymore. You understand that you are up there for good?

*Id.*

{¶ 16} Phillips then inquired about the types of questions he would be asked if he were to testify. He stated, "I don't want to just say yes or no. So my question is . . . am I directed to yes or no questions[?]" *Id.* The trial court explained the distinction between direct- and cross-examination and stated that Phillips's counsel would ask him open-ended questions but that prosecutors could ask leading questions on cross-examination:

> The structure of the questions follow[s] the Rules of Evidence. [Your attorney] has to ask open-ended questions, [the prosecutor] can ask leading questions. Okay. And if it gets hot on the stand, and I don't know -- I just hear what I hear in here. Okay. I haven't talked to you on the side or anything else like that, okay, but you got to take into some considerations there because they can be as aggressive as all get out on you, and you will kind of have to take it. . . . I mean, it's a tough choice for you.

*Id.* at 483-484. Counsel for both Phillips and the state confirmed that the trial judge's explanation was correct.

{¶ 17} When Phillips asked what the judge meant by "aggressive," the judge continued:

> Well, they can start going in there about you are on the stand so they can -- they can ask you questions about any felonies you have in the last 10 years for purpose of impeachment, they can ask questions about various other things. I have known people to get up there and just rock that podium and tear into you. Okay. That is one of the things you face. The more dangerous approach is, they take you down the road and then cut you up.

> That is most -- you won't see it coming and all of a sudden you are knee deep in trouble and [your attorney] is over there praying he can pull a miracle. But they don't have to necessarily be mean on you to take you down that path. I was very good at what we call the slow screw. I take you down the path and then chop you up. And you've had the video played. You've got that out there. You know, so the jury has been listening to both -- they will listen to both. But they can be aggressive with you.
>
> Now, do I allow them to come up here and get in your face, no, but they can sure sit back on that podium and in short of saying something bad about your mom, they can get real after you, okay, you know.
>
> . . . You know, sometimes as a criminal defense lawyer your wors[t] witness is your client, because they get up there and they h[em] and h[aw].
>
> [G]enerally speaking, I would tell my clients from day one, we need an understanding. You and I would have went through what it's like to sit up there on the stand, some of the questions you face, and generally after they went through that, they would sit there instead of saying I can beat that, they knew they might be in trouble.
>
> [Your attorney] is invested in this case like you're invested in this case, his reputation on the line as a trial lawyer, but clients can be difficult sometimes. And I'm not trying to be judgmental here at all. At times on the tape you were scattering around a bit, okay, and you got double tracked a couple times, you can't afford to do that on the stand. So you need to decide whether or not you are going to do it.

*Id.* at 484-487. The court then recessed for the evening before asking Phillips whether he would testify.

{¶ 18} The next morning, the court revisited the question of Phillips's right to testify and informed him that exercising his right to testify would waive his constitutional right to remain silent. Phillips stated that he understood. The court also stated:

> My bailiff thought I was being a little aggressive with you [yesterday]. Understand this is completely your decision. I was just trying to give you the various aspects around you that you had to take into consideration. I'm not telling you one way or the other what you should do; do you understand that?

(Aug. 17, 2023 Tr. Vol 4 at 498.) Phillips responded affirmatively. Before bringing the jury into the courtroom, the judge asked:

> THE COURT: Do you want to testify today?
>
> (No response.)
>
> You sure? You have the right to get up on the stand and defend yourself, but you also have the right to remain silent and it can't be used against you. I will specifically instruct them that they can't consider your silence for any purpose.

*Id*. at 501. Phillips responded, "No." *Id*. The trial court then denied Phillips's Crim.R. 29 motion for acquittal, and the defense rested without calling any witnesses.

### C. The verdict and sentence

{¶ 19} The jury found Phillips guilty of felony murder and kidnapping, but not guilty of domestic violence. The parties agreed that the felony murder and kidnapping counts merged for sentencing purposes, and the trial court sentenced Phillips on the felony murder count to 15 years to life in prison, consecutive to the sentences imposed in case Nos. 20CR-4710 and 20CR-5319.

## II. ASSIGNMENTS OF ERROR

{¶ 20} Phillips raises six assignments of error on appeal for this court's review:

> [1.] APPELLANT WAS DEPRIVED OF THE RIGHT TO TESTIFY ON HIS OWN BEHALF IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION, CONSTITUTING STRUCTURAL ERROR.
>
> [2.] THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED APPELLANT A FAIR TRIAL AND DUE PROCESS BY ADMITTING REPETITIVE, GRUESOME PHOTOGRAPHS OF THE DECEASED AND ALLOWING REPEATED REFERENCES TO THE GORY NATURE OF THE CRIME SCENE.
>
> [3.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT REFUSED TO INSTRUCT THE JURY ON THE INFERIOR OFFENSES OF INVOLUNTARY MANSLAUGHTER AND UNLAWFUL RESTRAINT IN VIOLATION OF OHIO LAW.

[4.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN INSTRUCTING THE JURY ON CONSCIOUSNESS OF GUILT DEPRIVING APPELLANT OF DUE PROCESS AND A FAIR TRIAL AND VIOLATED HIS STATE AND FEDERAL CONSTITUTIONAL PRIVILEGE AGAINST SELF INCRIMINATION.

[5.] THE TRIAL COURT ERRED IN ALLOWING LAY OPINION TESTIMONY FROM THE LEAD DETECTIVE ON MATTERS [OF] WHICH HE LACKED PERSONAL KNOWLEDGE.  SAID ERROR DEPRIVED APPELLANT OF DUE PROCESS AND A FAIR TRIAL.

[6.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

(Appellant's Brief at viii-ix.)

## III.  ANALYSIS

### A.  Assignment of error No. 1

{¶ 21} In his first assignment of error, Phillips maintains that the trial court committed structural error by improperly coercing him into not testifying, thereby denying his fundamental right to testify in his own defense. The state disputes Phillips's characterization of a violation of a defendant's right to testify as structural error, noting that neither the United States Supreme Court nor the Supreme Court of Ohio has squarely determined such an error to be structural.  The state further argues that, even if the violation of a defendant's right to testify were structural error, Phillips forfeited all but *plain* error by not raising it in the trial court.  Finally, the state maintains that Phillips fails to establish entitlement to relief under a plain-error analysis.

### 1.  The right to testify

{¶ 22} A criminal defendant has a fundamental right to testify in his or her own defense.  *Rock v. Arkansas*, 483 U.S. 44, 49 (1987); *State v. Bey*, 85 Ohio St.3d 487, 499 (1999).  Departing from the historic common-law view, the United States Supreme Court stated in *Rock*, "At this point in the development of our adversary system, it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and

to testify in his or her own defense." *Rock* at 49. That right derives from "several provisions in the [United States] Constitution," including the Fifth Amendment's guarantee against compelled testimony, the Compulsory Process Clause of the Sixth Amendment, and the Fourteenth Amendment's guarantee of due process. *Id.* at 51. A defendant's decision whether to testify " 'is an important tactical decision as well as a matter of constitutional right.' " *Bey* at 499, quoting *Brooks v. Tennessee*, 406 U.S. 605, 601 (1972). And it is a decision that is reserved solely for the defendant. *McCoy v. Louisiana*, 584 U.S. 414, 422 (2018), citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Bey* at 499.

{¶ 23} As with other constitutional rights, a criminal defendant may forfeit or waive the right to testify. A defendant in a criminal case forfeits a constitutional right by failing to timely assert it before a tribunal having jurisdiction to determine it. *United States v. Olano*, 507 U.S. 725, 731 (1993), citing *Yakus v. United States*, 321 U.S. 414, 444 (1944). Exercise of the " 'constitutional right to testify is contingent upon a timely demand by the defendant' " to testify. *State v. Smith*, 2023-Ohio-1533, ¶ 14 (11th Dist.), quoting *State v. Stewart*, 2002-Ohio-3842, ¶ 53 (11th Dist.); *see also State v. Brock*, 2009-Ohio-4590, ¶ 14 (6th Dist.) (presuming waiver of the right when the record did not indicate that the defendant asserted his right to testify). A defendant is not denied the right to testify when there is nothing in the record to support that the defendant "misunderstood or was unaware of his right to testify" or that he "wanted to testify and was denied the opportunity to do so." *Bey* at 499; *see also State v. Harris*, 2020-Ohio-5425, ¶ 16 (8th Dist.) ("A defendant's silence in the face of his attorney's decision not to call him as a witness effectively waives the right to testify on his own behalf"), citing *Bey*. A "trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Emphasis in original.) *Bey* at 499.

### 2. Plain error

{¶ 24} Generally, "an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Childs*, 14 Ohio St.2d 56, 61 (1968), citing *State v. Glaros*, 170 Ohio St. 471, (1960), paragraph one of the syllabus; *see also, State v. Long*, 53 Ohio St.2d 91, 95 (1978), quoting *Gendron v. United States*, 295 F.2d 897, 902 (8th Cir. 1961) (" 'The normal rule is

that an appellate court should not consider questions which have not been properly raised in the trial court and upon which the trial court has had no opportunity to pass.' "). Crim.R. 52(B) provides an exception to that general rule, however. It states, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Thus, an appellate court may review only for plain error a claimed defect that the defendant forfeited by not raising it before the trial court. *State v. Bond*, 2022-Ohio-4150, ¶ 10, citing *State v. West*, 2022-Ohio-1556 (plurality opinion).

{¶ 25} To prevail under the plain-error doctrine, the defendant "must establish that 'an error occurred, that the error was obvious, and that there is "a reasonable *probability* that the error resulted in prejudice." ' " (Emphasis added in *Rogers*.) *State v. Bailey*, 2022-Ohio-4407, ¶ 8, quoting *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, quoting *State v. Rogers*, 2015-Ohio-2459, ¶ 22. "The elements of the plain-error doctrine are conjunctive: all three must apply to justify an appellate court's intervention." *Id.* at ¶ 9, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). The Supreme Court of Ohio has "acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Barnes* at 27, quoting *Long*, at paragraph three of the syllabus. Thus, even if an appellant demonstrates the existence of plain error, "an appellate court is not required to correct it." *Rogers* at ¶ 23.

### 3. Structural and harmless error

{¶ 26} Phillips does not argue the elements of plain error in his appellate brief but instead argues that the trial court committed *structural* error by denying his right to testify and that the existence of structural error removes the matter from the ambit of harmless-error review.[1]

{¶ 27} An appellate court applies harmless-error review "when a defendant objects to an error at trial." *Bond* at ¶ 23. The harmless-error doctrine arises out of Crim.R. 52(A), which states, "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." In other words, a trial error that does not affect substantial rights will not warrant reversal of the trial court's judgment. Under harmless-error review,

---

[1] In his reply brief, Phillips responds to the state's appellate argument by claiming the trial court committed plain error.

the state " 'bears the burden of demonstrating that the error did not affect the substantial rights of the defendant.' " *Id.*, quoting *State v. Perry*, 2004-Ohio-297, ¶ 15. If the defendant establishes error on appeal and if the government does not satisfy its burden under Crim.R. 52(A) of establishing that the error was harmless, *i.e.*, did not affect the defendant's substantial rights, then the appellate court must reverse the conviction. *Perry* at ¶ 15.

{¶ 28} Certain errors, however, may not be ignored based on the government's assertion that they were harmless. Structural errors "are constitutional defects that defy analysis by harmless-error standards because they 'affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " *Bond* at ¶ 26, quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-310 (1991). They permeate " 'the entire conduct of the trial from beginning to end," such that the trial cannot " 'reliably serve its function as a vehicle for determination of guilt or innocence.' " *Fulminante* at 309-310, quoting *Rose v. Clark,* 478 U.S. 680, 577-578 (1986). Characterizing an error as a structural error "carries with it no talismanic significance." *West*, 2022-Ohio-1556, at ¶ 25 (plurality opinion). It "means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.' " *Id.*, quoting *Weaver v. Massachusetts*, 582 U.S. 286, 295-296 (2017), citing *Chapman v. California*, 386 U.S. 18, 24 (1967). When a defendant has objected to a structural error at trial and demonstrates that error on appeal, " 'the defendant is generally entitled to "automatic reversal" regardless of the error's actual "effect of the outcome." ' " *Bond* at ¶ 42 (DeWine, J., concurring in judgment only), quoting *Weaver* at 289, quoting *Neder v. United States*, 527 U.S. 1, 7 (1999).

### 4. An unobjected-to structural error is subject to plain-error review

{¶ 29} A party asserting a structural error is not entitled to automatic reversal if the party did not object to that error in the trial court. Rather, as with other unobjected-to errors, the appellate court must undertake a plain-error analysis. *West* at ¶ 28 (plurality opinion), ¶ 38-41 (Donnelly, J., dissenting). Six months after deciding *West*, the Supreme Court applied plain-error analysis to a claimed structural error in *Bond*, thereby making clear that characterization of an error as structural is not sufficient to demonstrate entitlement to automatic reversal. In *Bond*, the Supreme Court considered "the extent to

which the existence of structural error is relevant to" a plain-error analysis, when the defendant did not object to the error at trial. *Bond* at ¶ 10.

{¶ 30} The Supreme Court offered guidance in *Bond* regarding application of the third prong of the test for plain error—that the error affected substantial rights—in the context of structural errors. Although it acknowledged that, "[w]hen a recognized structural error has occurred, that error is certainly plain," it went on to hold that the error also must have "affected substantial rights" before it may be corrected under Crim.R. 52(B). *Id.* at ¶ 19. Thus, characterization of an error as structural is not, itself, sufficient to demonstrate that the error affected substantial rights for purposes of plain error review.

{¶ 31} The Supreme Court had previously interpreted affecting substantial rights " 'to mean that the trial court's error must have affected the outcome of the trial.' " *Id.* at ¶ 17, quoting *Barnes*, 94 Ohio St.2d at 27. But after reviewing the various rationales upon which errors have been deemed structural, the court concluded that there may be other ways in which "a structural error may affect substantial rights[,] even if the defendant cannot show that the outcome of the trial would have been different had the error not occurred."[2] *Id.* at ¶ 32. For example, "because it has been recognized that denying an indigent criminal defendant an attorney results in a fundamentally unfair trial, it cannot be said that a defendant's being denied counsel does not also affect that defendant's substantial rights, even if the defendant cannot show a reasonable probability of a different trial outcome had counsel been appointed." *Id.* at ¶ 30. Thus, it stated, "to honor the nature of a structural error within a plain-error analysis, we must recognize that a defendant may show that a structural error to which he has failed to object at trial may have affected substantial rights for the purposes of a plain-error analysis, even if the defendant cannot show that but for the error, the outcome of the trial would have been different." *Id.* at ¶ 33. The majority in *Bond* cautioned, however, "We do *not* hold that prejudice will be presumed in such cases but simply conclude that there is room in plain-error review to recognize the unique nature and fundamental import of established structural errors." (Emphasis added.) *Id.* at ¶ 34.

---

[2] The Supreme Court of Ohio recognized that the United States Supreme Court has declined to answer whether "affecting substantial rights" for purposes of plain-error review is always synonymous with "prejudicial" and has, instead, left open the door for other methods of establishing that a structural error affected substantial rights. *Bond*, 2022-Ohio-4150, at ¶ 23, citing *Olano*, 507 U.S. 725 at 735.

{¶ 32} Following the Supreme Court's guidance in *West* and *Bond*, we conclude that Phillips's assertion that the trial court violated his constitutional right to testify is subject to a plain-error analysis, whether or not a violation of that right is structural.

### 5. Phillips does not establish plain error

{¶ 33} The Supreme Court did not determine whether the error in *Bond*—limiting access to the courtroom during a criminal trial—was a structural error or whether the error violated the defendant's substantial rights. Instead, having determined that plain-error review applied, it decided the case on the final requirement for establishing entitlement to correction of plain error—that correction is required "to prevent a manifest miscarriage of justice" or that "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. at ¶ 35, citing *Olano* at 725 and *Long*, at paragraph three of the syllabus. In determining that correction was not warranted in *Bond*, the Supreme Court reasoned that the courtroom closure was partial and did not apply to either Bond's or the victim's immediate families. It noted that Bond had not asserted that any specific person had been denied access after attempting to enter the courtroom and had not claimed any specific harm because of the partial courtroom closure.

{¶ 34} We likewise conclude that reversal of Phillips's convictions is not required to prevent a manifest miscarriage of justice or to protect the fairness, integrity, or public reputation of judicial proceedings. First, Phillips was not completely denied the opportunity to testify. To the contrary, the trial court began its on-the-record discussion with Phillips by explicitly informing Phillips of his "constitutional right to defend [him]self and testify." (Aug. 16, 2023 Tr. Vol. 3 at 482.) The trial court repeatedly reminded Phillips of that right throughout its discussion with Phillips. *See id*. at 483 ("You have the right to go up there"); (Aug. 17, 2023 Tr. Vol. 4 at 501) ("You have the right to get up on the stand and defend yourself."). The court emphasized that the choice whether to testify was Phillips's own. *See id*. Vol. 3 at 484 ("it's a tough choice for you"); *id*. at 487 ("you need to decide whether or not you are going to do it"). The overnight recess gave Phillips the opportunity to consult with his attorney about whether to testify, and when the trial court reconvened, it reiterated to Phillips the choice whether to testify "is completely your decision." *Id*. Vol. 4 at 498. Phillips acknowledged that the judge was not "telling [him] one way or the other what [he] should do." *Id*. Immediately before Phillips declined to

testify, the trial court yet again told him, "You have the right to get up on the stand and defend yourself, but you also have the right to remain silent and it can't be used against you. I will specifically instruct [the jurors] that they can't consider your silence for any purpose." *Id.* at 501.

{¶ 35} Relatedly, the record does not include any statement by Phillips invoking the right to testify. Exercise of a defendant's constitutional right to testify is contingent upon a timely demand to testify. *State v. Strull*, 2024-Ohio-1118, ¶ 14 (11th Dist.), citing *State v. Smith*, 2023-Ohio-1533, ¶ 14 (11th Dist.); *State v. Miller*, 2015-Ohio-644, ¶ 36 (3d Dist.), citing *State v. Stewart*, 2002-Ohio-3842, ¶ 53 (11th Dist.); *State v. Ashley*, 2000 Ohio App. LEXIS 2724, *16 (4th Dist. June 14, 2000) ("appellant fails to point to any credible evidence or to any overt action on his part to bring to the trial court's attention appellant's desire to testify"), citing *State v. Sims*, 1982 Ohio App. LEXIS 11990, *10 (8th Dist. Apr. 1, 1982); *see also State v. Thomas*, 2002-Ohio-6624, ¶ 43 ("Nothing in the record suggests that defendant wanted to testify and was denied the opportunity to do so."). When a defendant does not " 'alert the trial court' that he desires to testify" or that he disagrees with counsel's recommendation that he should not testify, "waiver of the right to testify may be inferred from the defendant's conduct." *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000), quoting *Pelzer v. United States*, 1997 U.S. App. LEXIS 719, *5 (6th Cir. Jan. 13, 1997). Phillips did not inform the trial court that he was choosing to exercise his right to testify. At most, we know that Phillips asked off-the-record "*questions* . . . about taking the stand," and follow-up questions during the court's on-the-record conversation with Phillips. (Emphasis added.) (Tr. at 481.) We disagree with Phillips's assertion on appeal that asking questions "expressed his desire to testify." (Appellant's Reply Brief at 4.) Despite repeated advisements of his right to testify and that it was his choice to make, Phillips never stated that he wanted to testify.

{¶ 36} Even assuming the trial court's answers to Phillips's questions and its discussion of the potential dangers of testifying overstepped the bounds of judicial inquiry and affected Phillips's decision not to testify, this is not a case in which the defendant had affirmatively asserted his right to testify but then changed his mind because of warnings from the trial court. *Compare State v. Campbell*, 2017-Ohio-5665, ¶ 35-36 (trial court's inquiry after defendant was called to the stand resulted in the defendant "changing his

mind" about testifying). That was the case in *Arthur v. United States*, 986 A.2d 398, 407 (D.C.C.A. 2009), in which the court of appeals for the District of Columbia held that the trial court violated the appellant's right to testify when, *after the appellant asserted his choice to testify*, the trial judge sua sponte addressed appellant about the advisability and risk of taking the stand, which led the appellant to change his mind. The court of appeals stated, "Viewed in context, by continuing to suggest 'reasonable' alternatives to the decision appellant had already made, *the trial court implicitly refused to accept appellant's decision to testify* and brought the power of the court to bear on appellant such that his subsequent decision not to testify cannot be said to have been truly voluntary." (Emphasis added.) *Id.* at 410-411. Taken as a whole, the circumstances called into question the validity of the appellant's waiver of the right to testify. *Id.* "In probing appellant's decision to testify, the trial court went beyond the realm of proper judicial inquiry -- whether the defendant is informed of his right to testify and has made a decision -- to impermissibly questioning the wisdom of the defendant's actual decision." *Id.*

{¶ 37} Unlike in *Arthur*, neither Phillips nor his counsel affirmatively stated that Phillips had chosen to invoke his right to testify. Phillips's questions to the trial court, in fact, evidenced that Phillips had not yet made that decision. He first asked the trial court whether, *if* he testified, he would be limited to answering "yes or no questions." *Id.* at 482. He later asked the trial court to clarify what it meant by saying the prosecutor could be "aggressive." *Id.* at 484. These are questions of a defendant who continues to weigh his options. The trial court answered Phillips's questions and afforded both the prosecution and defense counsel opportunities to object, twice specifically asking counsel if the court had misstated anything. On both occasions, prosecutors and defense counsel responded in the negative. Again and again, the trial court told Phillips that whether to testify was his choice, and in the end, the court stated, it "is completely your decision. . . . I'm not telling you one way or the other what you should do." *Id.* at 498.

{¶ 38} Furthermore, the overnight recess before the trial court asked Phillips for his decision whether to testify provided Phillips the opportunity to reflect on his decision and to discuss it (as well as anything the trial court had said) with counsel before finally deciding whether to testify. In *Webber,* the Sixth Circuit Court of Appeals rejected the defendant's argument that the trial court's colloquy regarding the potential for a sentencing

enhancement interfered with his right to testify by essentially leveling " 'a veiled threat' " that the court would find the defendant guilty of perjury and obstruction of justice if he testified. *Webber*, 208 F.3d at 552. The Sixth Circuit emphasized that the defendant "had ample opportunity to confer with his attorney after the trial court's statements," that the trial court stated that it was not trying to " 'chill' or 'inhibit' " the defendant's decision, and that the defendant did not make any objection that he wanted to testify. *Id.* at 553. It held that the trial court's colloquy "was neither excessive nor so egregious that Defendant's ability to knowingly and intentionally waive his right to testify was impaired." *Id.* at 552, citing *United States v. Joelson*, 7 F.3d 174, 178 (9th Cir. 1993) (despite the trial court's "troubling" discussion with the defendant about following his attorney's advice, the trial court told the defendant he had the right to testify and gave him the opportunity to confer with counsel; "Although the district court's advice perhaps was inadvisable, it was not so egregious that Joelson's ability to knowingly and intentionally waive his right to testify was impaired."). As in *Webber* and *Joelson*, the overnight recess afforded Phillips time to confer with his attorney after the trial court's statements and before making the decision whether to testify, and Phillips thereafter stated he understood the trial court was not "telling [him] one way or the other what [he] should do." (Tr. Vol. 4 at 498.) Like those courts, we find no evidence that Phillips's ability to knowingly and intentionally waive his right to testify was impaired by the trial court's statements.

{¶ 39} Under these circumstances, we cannot conclude that reversal of Phillips's conviction is warranted under the plain-error standard of review. Even assuming both that the trial court committed an obvious error by informing Phillips of the risks of testifying and that the error affected Phillips's substantial rights, this case does not present the exceptional circumstance in which correction of an unobjected-to error is required to avoid a manifest miscarriage of justice. Nor do we conclude that Phillips has demonstrated an error that seriously affects the fairness, integrity, or public reputation of judicial proceedings, warranting correction as plain error. Accordingly, we overrule Phillips's first assignment of error.

## B. Assignment of Error No. 2

{¶ 40} In his second assignment of error, Phillips argues that the trial court abused its discretion by admitting into evidence repetitive, gruesome photographs of J.F.'s body—

both from the autopsy and the crime scene—and by allowing witnesses to refer to the gory nature of the crime scene. We disagree.

{¶ 41} The admission of photographic evidence, including photographs of a murder victim, is within the sound discretion of the trial court. *State v. Hill*, 12 Ohio St.2d 88, 90 (1967). We review a trial court's admission of such evidence under an abuse of discretion standard of review. *State v. Albert*, 2015-Ohio-249, ¶ 10 (10th Dist.). An abuse of discretion connotes an attitude by the trial court that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). " 'Unless the trial court clearly abuses its discretion, and the defendant has been materially prejudiced thereby,' we will not disturb the trial court's decision." *State v. Ware*, 2004-Ohio-6984, ¶ 32 (10th Dist.), quoting *State v. Woodward*, 2004-Ohio-4418, ¶ 49 (10th Dist.).

{¶ 42} When considering the admissibility of photographic evidence in non-capital cases, a trial court must employ the balancing test set out in Evid.R. 403. *State v. Jones*, 2019-Ohio-2134, ¶ 33 (10th Dist.). Evid.R. 403(A) provides, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Autopsy photographs— even if gruesome—are not per se inadmissible. *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). The mere fact that a photograph "is gruesome or horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury.' " *Hill* at 90-91, quoting *State v. Woodards*, 6 Ohio St.2d 14, 24 (1966).

{¶ 43} The defense filed a motion in limine, asking the trial court to exclude the 83 autopsy photos the state intended to introduce at trial; it subsequently raised a standing objection to the autopsy photos. The defense argued that the autopsy photos were irrelevant and inadmissible under Evid.R. 401. Alternatively, the defense argued that the autopsy photos were inadmissible under Evid.R. 403(A), because the danger of unfair prejudice substantially outweighed their probative value, in part because they were cumulative of the photos taken at the crime scene. The trial court went through each of the autopsy photos with counsel, on the record, and allowed the admission of only 11 of the 83 photos, excluding the remaining photos as irrelevant, overly inflammatory, or repetitive.

{¶ 44} Of the 11 autopsy photos admitted into evidence, one depicts only the coroner's case number and "Unknown Decedent," and another depicts only the sealed body bag; neither of these photos is gruesome or prejudicial. The other photos show: (1) how J.F.'s body appeared when Dr. Pandey opened the body bag, showing extensive trauma to J.F.'s face (Ex. B-3; Tr. Vol. 3 at 467); (2) bruising on J.F.'s left hand (Ex. B-4; Tr. Vol. 3 at 467); (3) bruising and greasy material on J.F.'s right hand (Ex. B-5; Tr. Vol. 3 at 468); (4) a frontal view of J.F., showing her "distorted face" and "extensive trauma in which some of the internal organs are coming out from the pelvis" (Ex. B-6; Tr. Vol. 3 at 468); (5) trauma to and asymmetry of J.F.'s legs and feet (Ex. B-7; Tr. Vol. 3 at 468); (6) trauma to J.F.'s left wrist (Ex. B-8; Tr. Vol. 3 at 468); (7) lacerations, fractures, and greasy material on J.F.'s left ankle and leg (Ex. B-9; Tr. Vol. 3 at 468); (8) abrasions on J.F.'s right knee and thigh (Ex. B-10; Tr. Vol. 3 at 469); and (9) trauma to and greasy, blackened material on J.F.'s back (Ex. B-11; Tr. Vol. 3 at 469). The state does not dispute that some of the admitted photos are gruesome. (Appellee's Brief at 30.)

{¶ 45} Phillips argues there was no dispute that J.F. had been struck by multiple vehicles, and he offered to stipulate to the coroner's report regarding the cause of J.F.'s death, but the state refused the stipulation. Because he did not contest the cause of death, Phillips contends the autopsy photos were irrelevant and added nothing to the case except prejudice. (Appellant's Brief at 28-30.) We disagree.

{¶ 46} A defendant's stipulation to the cause of the victim's death does not automatically render photos of the victim inadmissible. *State v. Jalowiec*, 91 Ohio St.3d 220, 229 (2001), citing *Maurer* at 265. "Autopsy photographs are generally admissible to help the jury appreciate the nature of the crimes, to illustrate the coroner's or other witnesses' testimony by portraying the wounds, to help prove the defendant's intent, and to show the lack of accident or mistake." *State v. Shakoor*, 2003-Ohio-5140, ¶ 73, (7th Dist.), citing *State v. Gross*, 2002-Ohio-5524, ¶ 52. The autopsy photos here were relevant to illustrate Dr. Pandey's testimony about the autopsy she performed and the conclusions she drew from her examination. And we cannot say that the probative value of the photos, even if reduced by Phillips's offer to stipulate to Dr. Pandey's report, was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Dr. Pandey only briefly described what was shown in each of the admitted photos,

which "supported [her] testimony and provided a perspective of" J.F.'s wounds. *State v. Lang*, 2011-Ohio-4215, ¶ 142, citing *State v. Trimble*, 2009-Ohio-2961, ¶ 148. The prosecution did not dwell on the photos but presented them "in a straightforward way" to illustrate Dr. Pandey's testimony and did not "call special attention to the photos." *State v. Tatum*, 2005-Ohio-1527, ¶ 17 (10th Dist.). Further, when asked during voir dire whether they would be disturbed by graphic photos, none of the prospective jurors responded affirmatively, *see United States v. Collins*, 368 Fed.Appx. 517, 523 (5th Cir. 2010), and there is no indication that any of the jurors were unduly affected upon seeing the photos. *See State v. Ford*, 2019-Ohio-4539, ¶ 242. Finally, the trial court's careful consideration of each photo and its rejection of 72 photos weighs heavily against a finding that the trial court's admission of the remaining 11 autopsy photos was unreasonable, arbitrary, or unconscionable.

{¶ 47} Phillips also complains under his second assignment of error about the admission into evidence of photos taken at the crime scene, but neither Phillips's motion in limine nor his standing objection to the remaining autopsy photos in the trial court extended to the crime-scene photos. In fact, part of defense counsel's argument in support of his motion in limine was that the autopsy photos would be duplicative of crime-scene photos the jury would see. Defense counsel also stated on the record, after the trial court finished reviewing the autopsy photos, that he was "okay with the scene photos." (Aug. 2, 2023 Tr. Vol. 2 at 210.) Hence, having not objected to the crime-scene photos in the trial court, Phillips can complain only of plain error with respect to the admission of the crime-scene photos on appeal. *See Ford* at ¶ 245. Phillips makes no claim of plain error in this regard, but it would fail even if he did. Phillips cannot demonstrate that the admission of the crime-scene photos amounted to an abuse of discretion, let alone plain error. The crime-scene photos showing blood stains on Westerville Road, the vehicles that ran over J.F.'s body, and J.F.'s body under a sheet are not particularly gruesome, and the trial court cannot be said to have abused its discretion in admitting them, especially given defense counsel's agreement to their admission at trial. Nor did the trial court abuse its discretion in admitting the one gruesome photograph, showing J.F.'s uncovered body where it came to rest on the roadway, as photographs showing bodies as discovered are probative and admissible. *State v. Sharpe*, 2023-Ohio-2570, ¶ 36 (7th Dist.), citing *Trimble*, 2009-Ohio-2961, at ¶ 135.

{¶ 48} Phillips also argues under this assignment of error that the trial court abused its discretion by admitting BCI agent Holcomb's testimony that, of the approximately 80 homicides he had worked, he remembered this case because of the "gruesomeness of the scene." (Tr. Vol. 3 at 421.) Phillips offers no basis for concluding that Holcomb's statement was unfairly prejudicial. Holcomb's single statement that the crime scene was "gruesome" has no independent prejudicial shock value, separate from the evidence the jury had already seen and heard, and any error with respect to that statement would be harmless, given the substantial evidence against Phillips, including the surveillance video showing multiple vehicles running over J.F.'s body. *See, e.g.*, *State v. Hood*, 2012-Ohio-6208, ¶ 43 (error in the admission of evidence is harmless when the remaining evidence, standing alone, is overwhelming proof of the defendant's guilt); *State v. Ceron*, 2013-Ohio-5241, ¶ 102 (8th Dist.) (erroneous admission of other-acts evidence was harmless when substantial other evidence supported the guilty verdict); *State v. Cody*, 2002-Ohio-7055, ¶ 15 (8th Dist.) ("A non-constitutional error in the admission or exclusion of evidence is harmless if substantial other evidence supports the verdict.").

{¶ 49} Having concluded that the trial court did not abuse its discretion in admitting 11 photos from the autopsy, the crime-scene photos, or Holcomb's statement about the gruesomeness of the crime scene, we overrule Phillips's second assignment of error.

## C. Assignment of Error No. 3

{¶ 50} Phillips's third assignment of error states that the trial court erred by refusing to give jury instructions on involuntary manslaughter, as an inferior offense of felony murder, and unlawful restraint, as a lesser-included offense of kidnapping. We review a trial court's refusal to instruct a jury on lesser-included offenses under the abuse of discretion standard of review. *State v. Ferrell*, 2020-Ohio-6879, ¶ 32 (10th Dist.), citing *State v. Coleman-Muse*, 2016-Ohio-5636, ¶ 8 (10th Dist.).

{¶ 51} Determining whether a trial court should submit an offense to the trier of fact as a lesser-included offense involves a two-tiered analysis. *State v. Deanda*, 2013-Ohio-1722, ¶ 6, citing *State v. Evans*, 2009-Ohio-2974, ¶ 13. First, the court must determine whether the offense for which an instruction is sought is generally a lesser-included offense of the charged offense. *Id.*, citing *State v. Kidder*, 32 Ohio St.3d 279, 281 (1987). Next, the court must look to the evidence and determine whether " ' "a jury could reasonably find the

defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense." ' " *Id.*, quoting *Evans* at ¶ 13, quoting *Shaker Hts. v. Mosely*, 2007-Ohio-2072, ¶ 11. A charge on a lesser-included offense "is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser-included offense." *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus.

{¶ 52} Phillips was charged with felony murder under R.C. 2903.02(B), which requires causing another's death as a proximate result of committing or attempting to commit a first- or second-degree felony offense of violence. The predicates for Phillips's felony-murder charge, as alleged in the indictment, were kidnapping and/or felonious assault. Phillips was separately charged with kidnapping under R.C. 2905.01(A)(3), which states, "No person, by force, threat, or deception . . . shall remove another from the place where the other person is found or restrain the liberty of the other person . . . [t]o terrorize, or to inflict serious physical harm on the victim or another."

{¶ 53} Phillips's counsel requested jury instructions on involuntary manslaughter and unlawful restraint. R.C. 2903.04(B) defines the offense of involuntary manslaughter and states, in part: "No person shall cause the death of another . . . as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree[.]" Phillips contends that the jury could have concluded that he caused J.F.'s death as a result of committing or attempting to commit, not felony kidnapping, but unlawful restraint under R.C. 2905.03(A), a misdemeanor. R.C. 2905.03(A) states, "No person, without privilege to do so, shall knowingly restrain another of the other person's liberty." The state does not dispute that involuntary manslaughter predicated on unlawful restraint is a lesser-included offense of felony murder predicated on kidnapping. Nor does the state dispute that unlawful restraint is a lesser-included offense of kidnapping based on restraint. Nevertheless, the state maintains that the evidence presented at trial did not warrant jury instructions on the lesser-included offenses.

{¶ 54} Phillips's primary argument is that the jury could have concluded that he did not act with the purpose of terrorizing or inflicting serious physical harm on J.F., and that he was therefore not guilty of kidnapping (or felony murder based on kidnapping), but that he could have been found guilty of unlawful restraint and involuntary manslaughter. We

disagree. Otis heard a man and woman arguing outside her house and heard the man threaten, "You need to quit or I'm going to put my hands on you." (Tr. Vol. 2 at 306.) She then heard the woman screaming "at the top of her lungs" for help. *Id.* Reed saw a man chasing a woman through traffic across Westerville Road and into a parking lot, where the man grabbed the woman and looked like he was going to hit her. On the surveillance video, Phillips and J.F. enter the frame from the direction of Otis's house, as Phillips chases J.F. across Westerville Road, beside and behind a stopped car. The video depicts J.F. falling to the ground and, despite Phillips's denial that he hit J.F., shows Phillips punching her while she was down. He then drags her onto the dark street, where he leaves her. J.F. remained motionless on the street as several cars drove past, before the first car hit her body. The video unequivocally refutes Phillips's statements to Lt. Retherford he did not punch J.F. and that she volitionally crawled after him into the street. Phillips's claim that he did not punch J.F., but was merely trying to take her bag, is not only contrary to what is depicted in the surveillance video but is also undermined by the fact that Phillips did not, in fact, take J.F.'s bag, which was recovered as part of the crime-scene investigation. The video also plainly shows Phillips dragging J.F.'s unmoving body back into the southbound lanes of Westerville Road and leaving her in the dark, heavily trafficked street. Based on this evidence, no reasonable juror could have concluded that Phillips was guilty of unlawful restraint but lacked the requisite mental state for kidnapping. *See State v. Abdullah*, 2022-Ohio-3977, ¶ 40 (11th Dist.) (defendant's assault of victim after restraining her liberty demonstrated purpose under R.C. 2905.01(A)(3)); *State v. Al-Dor*, 2013-Ohio-5731, ¶ 18 (8th Dist.) (acts of violence against the victim meet the "terrorize" element in R.C. 2905.01(A)(3)).

{¶ 55} Since no reasonable juror could have acquitted Phillips of kidnapping while also convicting him of unlawful restraint, Phillips was not entitled to an instruction on unlawful restraint. Nor was he entitled to an instruction on involuntary manslaughter with a predicate of unlawful restraint. Accordingly, we overrule Phillips's third assignment of error.

**D. Assignment of Error No. 4**

{¶ 56} In his fourth assignment of error, Phillips maintains that the trial court erred and violated his right to due process and his privilege against self-incrimination by issuing a jury instruction on consciousness of guilt.

{¶ 57} At the state's request, the trial court included in the jury instructions the following:

> Testimony has been admitted indicat[ing] that the defendant fled the scene. You are instructed that he -- excuse me, you are instructed that the defendant's flight from the scene alone does not raise a [p]resumption of guilt, but it may tend to indicate the defendant's consciousness or awareness of guilt. If you find the facts do not support the defendant fled the scene, or if you find that some other motive prompted the defendant -- the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find the facts support the defendant engaged in such conduct or if you decide that the defendant was motivated by a consciousness or awareness of guilt[], you may, but are not required to, consider the evidence in deciding whether the defendant is guilty of the crimes charged. You alone determine what weight, if any, to be given to this evidence.

(Tr. Vol. 4 at 599-600.)

{¶ 58} A trial court should ordinarily give a requested jury instruction if it is a correct statement of law, if it is applicable to the facts of the case, and if reasonable minds might reach the conclusion sought by the requested instruction. *State v. Adams*, 2015-Ohio-3954, ¶ 240, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). Phillips does not dispute that the consciousness of guilt instruction that the trial court gave was a correct statement of law, but he maintains that it was not warranted by the evidence. We review a trial court's decision to give a particular jury instruction for abuse of discretion. *State v. Robinson*, 2019-Ohio-558, ¶ 30 (10th Dist.).

{¶ 59} Evidence of flight, meaning evidence of " 'some escape or affirmative attempt to avoid apprehension,' " is admissible to show consciousness of guilt. *State v. Robinson*, 2019-Ohio-558, ¶ 29 (10th Dist.), quoting *State v. Robinson*, 2007-Ohio-2388, ¶ 19 (1st Dist.). As the Supreme Court has explained, " ' "flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct are admissible as

evidence of consciousness of guilt, and thus of guilt itself." ' " *State v. Hand*, 2006-Ohio-18, ¶ 167, quoting *State v. Eaton*, 19 Ohio St.2d 145, 160 (1969), quoting 2 Wigmore, *Evidence*, § 276, at 11 (3d Ed. 1979). A consciousness-of-guilt jury instruction, based on the accused's flight, is appropriate when supported by sufficient evidence. *Id.*, citing *State v. Grindstaff*, 2014-Ohio-2581, ¶ 29 (7th Dist.). " ' "[E]vidence of flight to support an inference of guilt should generally be limited to situations when the activities associated with flight occur at a time and place near the criminal activity for which the defendant is on trial." ' " *Robinson*, 2019-Ohio-558, at ¶ 31 (10th Dist.), quoting *State v. White*, 2015-Ohio-3512, ¶ 48 (2d Dist.), quoting *State v. Wood*, 2011-Ohio-2314, ¶ 30 (2d Dist.).

{¶ 60} Phillips argues that the evidence did not support giving a consciousness of guilt instruction in this case. We disagree. The surveillance video shows Phillips leaving the scene immediately after assaulting J.F., dragging her into the street, and leaving her unmoving body in the path of traffic. Phillips, however, maintains that merely leaving the scene of a crime is not sufficient grounds for giving a consciousness-of-guilt instruction. *See State v. Davenport*, 2019-Ohio-2297, ¶ 44 (10th Dist.), quoting *State v. Ramos*, 2016-Ohio-7685, ¶ 28 (8th Dist.) (" 'Flight is more than merely leaving the scene of a crime—it would be unrealistic to expect persons who commit crimes to remain on the scene for ready apprehension.' "). In *Davenport*, we stated, "Flight requires an appreciation by the accused that he or she has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found." *Id.* at ¶ 44, citing *Ramos* at ¶ 28.

{¶ 61} Phillips knew he had been seen with J.F. and recognized by an employee at the Speedway gas station shortly before the altercation that led to J.F.'s death. He also acknowledged that at least one driver had stopped and witnessed him arguing with J.F. over the bag on Westerville Road, and that one driver stated they were going to call the police. He stated to Lt. Retherford, "I left because . . . we had already had police being called." (Ex. D. at 40:17.) When Phillips walked away from J.F., he knew she was in the dark street, in the path of traffic. Phillips initially walked to his mother's house, nearby on Benington Avenue, but after seeing that law enforcement had closed Westerville Road, he neither returned to the scene nor stayed at his mother's house. Rather, he traveled to his brother's house, where he remained at least through the next morning. Later, despite Lt. Retherford having spoken to Phillips's mother and having obtained an arrest warrant,

Phillips did not make himself available to investigators and did not talk to the police until two weeks after J.F.'s death. Contrary to Phillips's assertion, the evidence here supports an inference that Phillips took active measures to avoid being found.

{¶ 62} Under these circumstances, we conclude that the trial court did not abuse its discretion by giving a neutral jury instruction on consciousness of guilt. *See State v. Aekins*, 2023-Ohio-322, ¶ 119 (10th Dist.) (characterizing a jury instruction as "neutral in its effect, as it instructed the jury that it could, but was not required to, consider the evidence of appellant's flight in determining whether appellant was guilty of the crimes charged"). We therefore overrule Phillips's fourth assignment of error.

### E. Assignment of error No. 5

{¶ 63} In his fifth assignment of error, Phillips argues that the trial court erred by allowing Lt. Retherford's testimony about the contents of the surveillance video. He claims that Lt. Retherford provided improper lay opinion testimony about what he observed on the surveillance video.

{¶ 64} Phillips's counsel filed motions in limine on August 13 and 15, 2023, asking for exclusion of lay opinion testimony interpreting the contents of surveillance videos, including opinions about the identity of the persons depicted, the actions observed, and the purpose of those actions. The trial court did not expressly rule on the motions in limine. Nevertheless, during the prosecutor's questioning of Lt. Retherford, the trial judge cautioned that the surveillance video "kind of speaks for itself." (Tr. Vol. 2 at 338.)

{¶ 65} Lt. Retherford made two limited statements about the contents of the surveillance video during his direct testimony. He stated the video "shows Westerville Road and someone being beat up and laid in the middle of the roadway." *Id.* at 335. He also stated, "you see directly across two individuals, one running from the other." *Id.* We reject Phillips's argument that these statements crossed the line into the realm of inadmissible lay opinion testimony. Lt. Retherford did not offer an opinion about the contents of the video; he simply testified to what he saw when he viewed it. *See State v. Tench*, 2018-Ohio-5205, ¶ 221. Moreover, the trial court instructed the jury, "You are the sole determiners of the facts, okay, thus, it is up to you to evaluate the evidence and to reach your own conclusion about what took place at the scene." *Id.* at 371. In light of this instruction and the jury's ability to view the video during trial and to reach its own conclusions about what was

depicted, we cannot conclude that Lt. Retherford's limited statements about what he saw in the surveillance video had an impact on the jury's verdicts.

{¶ 66} Phillips also maintains that Lt. Retherford gave improper opinion testimony on what the surveillance video showed during his videotaped interrogation of Phillips, which was also played for the jury. On August 16, 2023, prior to the state playing the video of Lt. Retherford's interview with Phillips, the prosecutor informed the trial court the parties had agreed "to redact certain sections of [the interview video] where the detective is narrating the surveillance video." *Id.* at 352-353. Defense counsel informed the judge, "I watched the video since it's been redacted and I agree with it. It's fine." *Id.* at 354. Phillips's counsel acknowledged he "found nothing objectionable in the [redacted] video" of the interview that was subsequently played for the jury. *Id.* By consenting to the admission of the redacted interview video, Phillips waived any error regarding its admission. *See State v. Campbell*, 90 Ohio St.3d 320, 324 (2000) (" 'a litigant may not take advantage of an error which he himself invited or induced' "), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus; *State v. Lewis*, 1973 Ohio App. LEXIS 1895, *19 (10th Dist. Dec. 18, 1973) (defendant may not complain about error in the admission of evidence the defendant caused).

{¶ 67} For these reasons, we overrule Phillips's fifth assignment of error.

## F. Assignment of error No. 6

{¶ 68} Phillips's final assignment of error asserts that Phillips's convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

{¶ 69} A challenge to the sufficiency of the evidence focuses on " 'whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.' " *Dunn*, 2024-Ohio-5742, at ¶ 28, quoting *Dent*, 2020-Ohio-6670, at ¶ 15. Resolution of a sufficiency challenge does not involve a determination of the witnesses' credibility. *Columbus v. Gunthorp*, 2022-Ohio-138, ¶ 15 (10th Dist.). Rather, "[t]he weight of the evidence and credibility of the witnesses . . . are matters primarily for the finder of fact." *State v. Walker*, 2016-Ohio-8295, ¶ 12. Whether the evidence is legally sufficient to support a verdict is a question of law that we review de novo. *Dent* at ¶ 15.

{¶ 70} A judgment supported by sufficient evidence may nevertheless be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. Whereas sufficiency is a test of the adequacy of the evidence, a manifest-weight challenge "addresses the evidence's effect of inducing belief." *State v. Cassell*, 2010-Ohio-1881, ¶ 38 (10th Dist.), citing *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386. When reviewing a manifest-weight challenge to a criminal conviction:

> "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins* at 387, quoting *Martin*, 20 Ohio App.3d at 175. In conducting that review, "we are guided by the presumption that the jury . . . is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Abubakar*, 2011-Ohio-6299, ¶ 6 (10th Dist.), citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "If evidence is susceptible to more than one construction, reviewing courts must give it the interpretation that is consistent with the verdict and judgment." *Id.*, citing *White v. Euclid Square Mall*, 107 Ohio App.3d 536, 539 (8th Dist. 1995). Because a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding that the conviction is supported by sufficient evidence, the former finding is dispositive of the latter. *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.).

{¶ 71} Phillips claims the state did not prove he committed murder as a proximate result of committing kidnapping and/or felonious assault because the state failed to prove either underlying felony. He argues that no testifying witness observed him causing physical harm to J.F. and that he did not admit in his interview with Lt. Retherford that he kidnapped, assaulted, or murdered J.F. Phillips discounts the reliability of the surveillance video, stating it "is from quite a distance, in the dark, with grainy resolution" and that "[o]ne cannot tell who either person is in the video." (Appellant's Brief at 54.) Phillips further

argues that the surveillance video does not show him restraining J.F. or removing her from the place where she was found.

{¶ 72} Phillips confirmed during his interrogation with Lt. Retherford that he and J.F. were the two people visible in the surveillance video. Phillips and J.F. enter the frame of the surveillance video from the direction of Otis's house, where Otis had just heard a man outside her fence threaten physical harm to a woman, who then screamed for help. Reed testified that a man chased a woman behind Reed's stopped car on Westerville Road into a parking lot, where he grabbed her and "looked like he was about to swing on her." (Tr. Vol. 2 at 254.) Phillips confirmed that J.F. was the individual on the ground, as they purportedly struggled over her bag on the east side of Westerville Road, and that he was the person standing, holding a cellphone. Although he disputes that he punched J.F. while she was on the ground, the jurors could have reasonably rejected that explanation based on their viewing of the surveillance video and instead concluded that Phillips punched J.F. multiple times while she was on the ground, causing serious physical harm. *See* R.C. 2903.11(A)(1). Further, based on the lack of movement visible from J.F. as Phillips left her in the roadway, in the path of traffic, the jury could have reasonably determined that Phillips's punches rendered her unconscious or incapacitated. *See State v. Petty*, 2012-Ohio-2989, ¶ 34 (10th Dist.) (loss of consciousness because of an assault constitutes serious physical harm).

{¶ 73} Phillips confirmed to Lt. Retherford that he was the individual visible in the surveillance video walking westward across Westerville Road, although he denied that he was dragging J.F. across the road. He instead claimed he was pulling the bag to which J.F. continued to cling. Despite Phillips's claims during his interview with Lt. Retherford that, in the earlier portion of the surveillance video, he had been attempting to move J.F. *out* of the road, he admits that he ultimately walked away from J.F., leaving her on the road, in the path of traffic. J.F. remained motionless in the road as several cars drove by in the outside southbound lane, nearly hitting her, before she was finally hit for the first time, approximately 90 seconds after Phillips walked away. The jury could reasonably conclude from the surveillance video that Phillips restrained J.F., then forcibly removed her from the side of the road into the road and left her motionless body there, in the path of traffic, to terrorize or to inflict serious physical harm on her. *See* R.C. 2905.01(A)(3).

{¶ 74} The jury was not required to credit Phillips's denials of punching J.F. or forcibly removing J.F. from the side to the middle of the road. The jury independently reviewed the surveillance video, and it was the jury's obligation to determine what happened and whether Phillips's version of events, as told to Lt. Retherford, was credible. *See State v. Buckley*, 2017-Ohio-9358, ¶ 34 (5th Dist.). Even assuming the video was susceptible to more than one interpretation, we must give it the interpretation that is consistent with the jury's verdict. *See Abubakar* at ¶ 6. This is not a case in which the evidence weighs heavily against conviction, such that the jury created a manifest miscarriage of justice by returning verdicts of guilty on the charges of felony murder and kidnapping. Accordingly, we conclude that Phillips's convictions are not against the manifest weight of the evidence. And because Phillips's convictions are consistent with the manifest weight of the evidence, his challenge to the sufficiency of the evidence must likewise fail. Therefore, we overrule Phillips's sixth assignment of error.

## IV. CONCLUSION

{¶ 75} Having overruled each of Phillips's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, J., concurs.
MENTEL, J., dissents.

_____

MENTEL, J., dissenting.

{¶ 76} Being unable to agree with the majority, I respectfully dissent.

{¶ 77} In his first assignment of error, Phillips contends the trial court deprived him of his fundamental right to testify on his own behalf resulting in structural error. For the reasons that follow, I would sustain Phillips's first assignment of error, reverse Phillips's convictions, and remand for a new trial.

## I. Violation of Phillips's Right to Testify

{¶ 78} "The right to defend is personal" and a defendant's choice in exercising that right must be "honored out of 'that respect for the individual which is the lifeblood of the law.'" *Faretta v. California*, 422 U.S. 806, 834 (1975), quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring). The right to defend oneself against criminal

charges encompasses not only the right to self-representation, but also the right to "testify in one's own behalf." *McCoy v. Louisiana*, 584 U.S. 414, 422 (2018). Indeed, "[e]ven more fundamental to a personal defense than the right of self-representation . . . is an accused's right to present his own version of events in his own words. A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness." *Rock v. Arkansas*, 483 U.S. 44, 52 (1987). "In fact, the most important witness for the defense in many criminal cases is the defendant himself." *Id.*

{¶ 79} A defendant's right to testify in his or her own defense is grounded in several provisions of the United States Constitution.[3] The right to testify is " 'essential to due process of law in a fair adversary process' " and therefore protected by the Due Process Clause of the Fourteenth Amendment. *Id.* at 51, quoting *Faretta* at 819, fn. 15. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), quoting *In re Oliver*, 333 U.S. 257, 273 (1948) (noting a " 'person's right . . . to be heard in his defense -- a right to his day in court -- [is] basic in our system of jurisprudence' "). The right to testify is also protected by the Compulsory Process Clause of the Sixth Amendment, which grants a criminal defendant the right to call "witnesses in his favor." "Logically included in the accused's right to call witnesses whose testimony is 'material and favorable to his defense' . . . is a right to testify himself, should he decide it is in his favor to do so." *Rock* at 52. The right to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. *Id.* Indeed, " '[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so.' " *Id.* at 53, quoting *Harris v. New York*, 401 U.S. 222, 225 (1971). *See also* Ohio Constitution, Article I, Section 10 (providing the accused shall "have compulsory process to procure the attendance of witnesses in his behalf," and that "[n]o person shall be compelled, in any criminal case, to be a witness against himself").

---

[3] A defendant's right testify in their own defense is a departure from the historic common law view, "which was that all parties to litigation, including criminal defendants, were disqualified from testifying." *Rock* at 49. The rationale for this rule was "based on the theory that 'from the nature of human passions and actions there [was] more reason to distrust such biased testimony than to believe it.' " *United States v. Davis*, 974 F.2d 182, 186 (D.C.Cir. 1992), quoting Gilbert, Evidence 119 (Ca. 1726). Throughout the 1800s, states began enacting statutes providing for the competency of criminal defendants. *Ferguson v. Georgia*, 365 U.S. 570, 577 (1961). By 1878, Congress had enacted a federal statute establishing a presumption in favor of the accused's competency in all criminal trials. *Id.*, citing 18 U.S.C. § 3481. The United States Supreme Court's recognition of a defendant's right to testify in *Rock* "effectively [took] our law a full one hundred and eighty degrees – from a deep hostility toward the accused's testimony to a fundamental appreciation for it." *Davis* at 186.

{¶ 80} A defendant's right to testify "is regarded both as a fundamental and a personal right that is waivable only by an accused." *State v. Bey*, 85 Ohio St.3d 487, 499 (1999). Accordingly, the defendant's relinquishment of their right to testify must be knowing and intentional. *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000). Because the decision whether to testify "is an important tactical decision as well as a matter of constitutional right," *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972), counsel should "advise the defendant whether or not the defendant should take the stand." *Webber* at 551. However, the ultimate decision whether to testify is reserved solely for the defendant. *McCoy* at 422.

{¶ 81} Appellate courts in this state have noted a defendant's exercise of their " 'constitutional right to testify is contingent upon a timely demand by the defendant.' " *State v. Smith*, 2023-Ohio-1533, ¶ 14 (11th Dist.), quoting *State v. Stewart*, 2002-Ohio-3842, ¶ 53 (11th Dist.). *Accord State v. Ashley*, 2000 Ohio App. LEXIS 2724, *15 (4th Dist. June 14, 2000). When a "tactical decision is made not to have the defendant testify, the defendant's assent is presumed." *Webber*, 208 F.3d at 551. *See State v. Fry*, 2019-Ohio-958, ¶ 24 (9th Dist.) (explaining the defendant's assent is presumed in such scenario because "attorneys are presumed to follow the professional rules of conduct and presumed to render adequate assistance in advocating the defendant's cause and in consulting with the defendant on important decisions").[4]

{¶ 82} Thus, a defendant who wants to testify "must 'alert the trial court' that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand." *Webber* at 551, quoting *Pelzer v. United States*, 1997 U.S. App. LEXIS 719 (Jan. 13, 1997 6th Cir. 1997). A defendant may not sit idly by during the course of the proceedings and subsequently claim they wanted to testify. *See Bey*, 85 Ohio St.3d at 500 (finding "[n]othing suggest[ed] that Bey wanted to testify and was denied the

---

[4] In the present case, Phillips alleges only that the trial court deprived him of his right to testify. Phillips does not present an ineffective assistance of counsel claim regarding his right to testify. *See State v. Strong*, 2017-Ohio-859, ¶ 26 (6th Dist.), citing *State v. Ryan*, 2006-Ohio-5120, ¶ 24 (6th Dist.) (stating a defendant's decision not to testify "cannot be challenged on appeal on the grounds of ineffective assistance of counsel, unless it is shown that the decision was the result of coercion"); *United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir. 1992) (explaining that when the defendant claims his right to testify "was violated by defense counsel, this claim is properly framed as a claim of ineffective assistance of counsel"); *Rossignol v. State*, 152 Idaho 700, 706 (2012) (noting the "issue of the failure of a defendant to testify may be viewed . . . either as a claim of ineffective assistance of counsel or as a claim of a deprivation of a constitutional right," and the "appropriate inquiry depends upon on how the claim is pled and argued").

opportunity to do so"); *Smith*, 2023-Ohio-1533, at ¶ 15 (concluding the defendant waived her right to testify because "[a]t no time during trial did Appellant express any desire on the record to testify in her own behalf"); *State v. Miller*, 2015-Ohio-644, ¶ 22 (3d Dist.) (finding the defendant waived his right to testify because he "was completely silent and gave no indication that his counsel's statement was in any way inconsistent with his wishes," when counsel informed the court defendant would present no evidence); *Fry* at ¶ 27 (emphasis omitted) (noting the defendant's "conscious decision to remain silent instead of overtly asserting his right to testify [did] not comport with his present claim that he was denied the right to testify").

{¶ 83} While a defendant must knowingly and intelligently waive their right to testify, a trial court is not "*required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Emphasis in original.) *Bey* at 499. *Bey* explained such a colloquy between the trial judge and defendant risked " 'plac[ing] the judge between the lawyer and his client," and could "lead into the judge's evaluation of the wisdom of the defendant's decision, the substance of the testimony, or simply evoke a dramatic change in a previously carefully considered trial strategy." *Id.*, quoting *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991).

{¶ 84} The record demonstrates Phillips did not sit idly by or otherwise fail to provide the trial court with any indication he wanted to testify. Initially, at a May 11, 2022 pre-trial hearing, Phillips informed the judge he heard "false allegations" regarding the "[surveillance] video" at a previous bond hearing. (May 11, 2022 Tr. at 42.) The court responded noting Phillips admitted to Lieutenant Joshua Retherford he was the person depicted on the surveillance video. The court asked Phillips, "[t]hat wasn't you on the video?" (May 11, 2022 Tr. at 43.) Phillips responded stating, "[n]o." (May 11, 2022 Tr. at 43.) The court told Phillips he "[couldn't] say anything" because "[i]t was testified that [he] had admitted that [he was] the person on the video." (May 11, 2022 Tr. at 43.) Phillips told the court, "[y]ou know that's a modified video, right?" And indicated "these [were] details that somebody should have to speak upon when they are presenting evidence in the courtroom." (May 11, 2022 Tr. at 43.) Phillips explained he "didn't understand why [the defense] couldn't correct that," but noted his attorney told him he could not "just speak on them things. It has to be followed up with factual evidence and *your day is basically trial.*"

(Emphasis added.) (May 11, 2022 Tr. at 55.) The judge told Phillips that, when he was a practicing attorney, he would "sit down with [his] clients and we'd talk about simple concepts about whether you testify or not." (May 11, 2022 Tr. at 66.) The court told Phillips, "[a]nd what does it do for you in your defense in the way you've talked about it today, *are you almost going to have to take the stand.*" (Emphasis added.) (May 11, 2022 Tr. at 66-67.)

{¶ 85} At a July 20, 2022 pre-trial hearing, Phillips noted the court "judged [him]" off the surveillance video when Phillips "ha[d]n't had the opportunity to even speak on nothing yet." (July 20, 2022 Tr. at 9.) Phillips noted the prosecution's statements about the case were "full of lies," and the court cautioned Phillips he was "getting into trial stuff." (July 20, 2022 Tr. at 10.) Phillips told the court he was "ready -- I want to have a hearing where you got to analyze and you got -- *I get a chance to speak* and cross-examine somebody." (Emphasis added.) (July 20, 2022 Tr. at 10-11.) At a March 22, 2023 hearing following the initial mistrial on the case, Phillips's attorney noted Phillips was frustrated because he "ha[d]n't been able to explain our side of things" yet. (Mar. 22, 2023 Tr. at 27-28.)

{¶ 86} After the state rested at trial, the court addressed Phillips regarding "one of the questions [he] had about taking the stand."[5] (Aug. 16, 2023 Tr. Vol. 3 at 481.) The judge noted he had been "a defense lawyer for 22 years, okay, before [he] took the bench 18 years ago. [He] tried plenty of felonies." (Tr. Vol. 3 at 481.) The court told Phillips he had a "constitutional right to remain silent . . . and no one can comment on the fact that you have been silent. You also have a constitutional right to defend yourself and testify." (Tr. Vol. 3 481-82.) However, the court informed Phillips he needed to "understand a few things, once you opt to testify, once you get on that stand, you can't call a time out, I don't want to testify anymore, you're stuck. Okay. So if it's getting bad up there for you, you can't just say, no, no, no." (Tr. Vol. 3 at 482.) The court asked Phillips if he understood he was "up there for

---

[5] Generally, "defense counsel, not the court, has the primary responsibility for advising the defendant of his right to testify and for explaining the tactical implications for doing so or not." *United States v. Ortiz*, 82 F.3d 1066, 1070 (D.C.Cir. 1996). Indeed, whether to testify is "an important part of trial strategy best left to the defendant and counsel without the intrusion of the trial court, as that intrusion may have the unintended effect of swaying the defendant one way or the other." *United States v. Pennycooke*, 65 F.3d 9, 11 (3d Cir. 1995). *See also Webber*, 208 F.3d at 552. The colloquy between Phillips and the trial judge in the present case demonstrates why counsel, rather than the court, should generally answer the defendant's questions about taking the stand.

good?" (Tr. Vol. 3 at 482.)  Phillips responded stating, "I don't want to just say yes or no. So my question is . . . am I directed to yes or no questions[?]" *Id.*  The court proceeded to explain the distinction between the types of questions Phillips would receive on direct- and cross-examination.

{¶ 87}  Thus, prior to this point in the trial, Phillips made statements and asked questions indicating he wanted to testify.  The trial court's ensuing discussion with Phillips regarding his right to testify, however, was exceedingly problematic.

{¶ 88}  The court initially informed Phillips that, if he told his attorney he planned to lie on the stand, his attorney would have to "sit down" because counsel "[couldn't] suborn perjury, okay, because you just told him you were going to lie about something." (Tr. Vol. 3 at 483.)  The court reiterated to Phillips that, while he had the right "to go up there, . . . once [he was] up there, [he couldn't] call time out. . . .  [He would be] up there for good until [he was] done.  Okay." (Tr. Vol. 3 at 483.)  The court told Phillips, "[a]nd if it gets hot on the stand, and I don't know -- I just hear what I hear in here.  Okay. . . . [Y]ou got to take into some considerations there because they can be as aggressive as all get out on you, and you will kind of have to take it." (Tr. Vol. 3 at 483-84.)  The court noted it was "a tough choice for [Phillips]." (Tr. Vol. 3 at 484.)

{¶ 89}  Phillips, becoming concerned, asked the judge what he "mean[t] by 'aggressive'?" (Tr. Vol. 3 at 484.)  The court informed Phillips the prosecutors could ask him questions about any felonies he had in the last ten years and "various other things." (Tr. Vol. 3 at 484.)  The court then informed Phillips as follows:

> I have known people to get up there and just rock that podium and tear into you. Okay. That is one of the things you face. The more dangerous approach is, they take you down the road and then cut you up. That is most -- you won't see it coming and all of a sudden you are knee deep in trouble and [your attorney] is over there praying he can pull a miracle. But they don't have to necessarily be mean on you to take you down that path. I was very good at what we call the slow screw. I take you down the path and then chop you up. And you've had the video played. You've got that out there. You know, so the jury has been listening to both -- they will listen to both. But they can be aggressive with you.
>
> Now, do I allow them come up here and get in your face, no, but they can sure sit back on that podium and in short of saying

> something bad about your mom, they can get real after you, okay, you know.

(Tr. Vol. 3 at 484-85.)

{¶ 90} The judge further informed Phillips that, when the judge was a practicing defense attorney, he would "tell [his] clients from day one, we need an understanding. You and I would have went through what it's like to sit up there on the stand, some of the questions you face." (Tr. Vol. 3 at 486.) The court told Phillips that "generally after [his] clients] went through that, they would sit there instead of saying I can beat that, they knew they might be in trouble." (Tr. Vol. 3 at 486.) The court noted "sometimes as a criminal defense lawyer your wors[t] witness is your client, because they get up there and they h[em] and h[aw]." (Tr. Vol. 3 at 486.)

{¶ 91} The court addressed the evidence, telling Phillips that while the court was "not trying to be judgmental," at times during his interview with Lt. Retherford, Phillips was "scattering around a bit, okay, and you got double tracked a couple times, you can't afford to do that on the stand." (Tr. Vol. 3 at 486-87.) The court told Phillips he "need[ed] to decide whether or not you are going to do it. Okay. Any questions?" (Tr. Vol. 3 at 487.) Phillips responded, "[y]eah, on point." (Tr. Vol. 3 at 487.) Phillips's attorney did not object to any of the court's statements.

{¶ 92} Defense counsel then made a Crim.R. 29 motion for acquittal. After some discussion regarding the motion, the court indicated it would take the motion "under advisement until tomorrow morning" and recessed for the evening. (Tr. Vol. 3 at 492.)

{¶ 93} The next morning, outside the presence of the jury, the judge told Phillips he "forgot to say some magic words" the previous day. (Aug. 17, 2023 Tr. Vol. 4 at 497.) The court informed Phillips if he "[took] the stand, [he would] waive [his] Fifth Amendment right to be silent. Okay. That is one of the consequences. I described the reality of it but I didn't say those magic words; do you understand that?" (Tr. Vol. 4 at 497.) Phillips affirmed he understood. The judge acknowledged his bailiff thought the judge had been "a little aggressive with [Phillips the prior day]." (Tr. Vol. 4 at 498.) The court informed Phillips the choice whether to testify was "completely [his] decision. [The court] was just trying to give [him] the various aspects around [him] that [he] had to take into consideration. [The court was] not telling [him] one way or the other what [he] should do."

(Tr. Vol. 4 at 498.) The court asked Phillips if he wanted to testify, and the record documents "[n]o response" from Phillips. (Tr. Vol. 4 at 501.) The court then stated, "[y]ou sure? You have the right to get up on the stand and defend yourself, but you also have the right to remain silent and it can't be used against you." (Tr. Vol. 4 at 501.) Phillips responded stating, "[n]o." (Tr. Vol. 4 at 501.)

{¶ 94} Due to the "great disparity between the posture of the presiding judge and that of the witness," a trial judge violates a defendant's right to present a defense when the court admonishes a defense witness in a manner that "exert[s] such duress on the witness'[s] mind as to preclude him from making a free and voluntary choice whether or not to testify." *Webb v. Texas*, 409 U.S. 95, 98 (1972). In *Webb*, the trial judge "gratuitously singled out [the defense's sole] witness for a lengthy admonition on the dangers of perjury." *Id.* at 97. The trial judge "implied he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to [the witness's] present sentence, and that the result would be to impair his chances of parole." *Id.* at 97. Following the court's admonition, the witness refused to testify. The United States Supreme Court found the trial judge's "threatening remarks" effectively drove the witness "off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Id.* at 98. As such, the court reversed the defendant's conviction. *See also United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C.Cir. 1982) (noting a court's "warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify").

{¶ 95} While *Webb* concerned a defense witness, the prohibition against judicial coercion applies to "judicial behavior aimed at dissuading the defendant himself - not merely his witnesses - from testifying." *United States v. Davis*, 974 F.2d 182, 187 (D.C.Cir. 1992). *Accord F.C.L. v. Agustin*, 271 Or.App. 149, 157-58 (2015) (noting that *Webb*'s "reasoning plainly precludes a trial court intimidating a defendant himself or herself from testifying"); *Woolfolk v. Commonwealth*, 339 S.W.3d 411, 417 (Sup.Ct.Ky. 2011) (finding *Webb*'s "reasoning would apply with even greater force if it is the defendant who is being intimidated"). Accordingly, "judicial intimidation, threat, or overbearance" that impairs a "Defendant's ability to knowingly and intentionally waive his right to testify" violates a

defendant's right to due process. *Webber*, 208 F.3d at 552. *See also Davis* at 187 (noting a trial judge violates a defendant's due process rights by issuing "deliberate and badgering threats designed to quash significant testimony"); *United States v. Joelson*, 7 F.3d 174, 178 (9th Cir. 1993), quoting *United States v. Martinez*, 883 F.2d 750, 756 (9th Cir. 1989) (observing that "judicial interference" with the decision to testify "poses a danger . . . 'of great significance because the right not to testify counterpoises the right to testify, and the exercise of one is the waiver of the other' ").

{¶ 96} In *State v. Campbell*, 2017-Ohio-5665 (3d Dist.), the defense called the defendant to testify and the judge admonished the defendant, informing him that if he testified he would be subject to cross-examination, required to answer "questions [he] may not wanna answer" and "questions that might support a guilty finding." *Id.* at ¶ 35. The judge informed the defendant that "on a number of occasions, . . . a defendant will take the stand and actually provide information that is not favorable." *Id.* at ¶ 35. The defendant declined to testify following the court's admonishment. The appellate court reversed the defendant's conviction because the trial court unduly "influenced [defendant's] decision to waive his right to testify." *Id.* at ¶ 36.

{¶ 97} In *Arthur v. United States*, 986 A.2d 398 (D.C. 2009), the defendant informed the court he would testify, but the trial court continued to question the defendant's decision to testify. The court admonished the defendant regarding the "advisability and the risk of taking the stand," and told the defendant it would be reasonable for him not to testify, noting it was a "difficult decision" but also a decision the defendant "ha[d] to make." (Emphasis omitted.) *Id.* at 403-04, 407. Following the court's admonishment, the defendant refused to testify. *Id.* at 407. The appellate court found the "circumstances, taken as a whole, call[ed] into question the validity of [the defendant's] waiver." *Id.* at 407. The court noted that, "by continuing to suggest 'reasonable' alternatives to the decision appellant had already made, the trial court implicitly refused to accept appellant's decision to testify and brought the power of the court to bear on appellant such that his subsequent decision not to testify cannot be said to have been truly voluntary." *Id.* at 410-11. The court also found the trial court's comments inappropriately "interjected [the trial court] without apparent cause into the role of counsel" and "exert[ed] undue

pressure to accept what appellant could have perceived as the trial court's preferred strategy." *Id.* at 412.

{¶ 98} A trial judge may also exert undue coercion on a defendant's decision to testify if the court "depart[s] from his role as neutral decision-maker by predicting the outcome of a witness's decision to testify." *People v. Vaughn*, 354 Ill.App.3d 917, 926 (2004). *See also Arthur* at 411 (noting the trial court's "actions [were] of concern because they departed from that of a neutral magistrate"). For instance, in *F.C.L.* the trial judge told the defendant the state's witness was "very credible" and "ha[d] no reason to lie," and that the judge believed the defendant may "get on the stand and lie." *F.C.L.*, 271 Or.App. at 154. The appellate court found the trial court's comments amounted to reversible error because they "would suggest to a person in defendant's position that the court had abandoned its role as a neutral fact finder and had already decided that if defendant testified, he would lie." *Id.* at 158.

{¶ 99} The circumstances of the present case call into question the validity of Phillips's waiver of his right to testify. The trial court told Phillips if he testified he could be "take[n] . . . down the road and then cut . . . up[;]" subjected to the "slow screw[;]" and "take[n] . . . down the path and then chop[ped] . . . up." (Tr. Vol. 3 at 484-85.) The court's statements indicating Phillips could be "take[n] . . . down the road" and "chop[ped] . . . up" were particularly egregious in the context of the present case, because the evidence demonstrated the victim was struck by multiple vehicles on a roadway resulting in her dismemberment. (Tr. Vol. 3 at 484-85.) The trial court also told Phillips if he testified the prosecutors could be "aggressive as all get out on [him]," they could "get real after [him]," and he would "kind of have to take it." (Tr. Vol. 3 at 484-85.) Notably, at the end of the court's discussion with Phillips, the court asked the prosecutors if they were "going to go after [Phillips] if he says something wrong [on the stand]?" One prosecutor responded "[w]e'll see," the other prosecutor responded "[o]h, yeah." (Tr. Vol. 3 at 487.) The court's comments to Phillips were clearly designed to intimidate him and drive him from the stand. Indeed, the court's own bailiff believed the trial judge had been "aggressive" with Phillips during the colloquy. (Tr. Vol. 4 at 498.)

{¶ 100} The trial judge also thoroughly interjected himself into the role of counsel in violation of *Bey*. The court's statements indicating that the judge had been a practicing

defense attorney for 22 years and his clients almost always decided not to testify demonstrated to Phillips the judge believed he should decline to testify. Similarly, the court's comment indicating that, "as a criminal defense lawyer your wors[t] witness is your client" because they "h[em] and h[aw]," served to reiterate to Phillips he should decline to testify because he would make a bad witness. (Tr. Vol. 3 at 486.) *See Miller*, 2015-Ohio-644, ¶ 44 (Rogers, P.J., dissenting) (noting that, "[c]ontrary to the reasoning in *Bey*, the trial court clearly evaluated the wisdom of Miller's desire to testify, interfering with the attorney-client relationship").

{¶ 101} The trial court also demonstrated to Phillips it had abandoned its role as a neutral factfinder. At a pre-trial hearing, the court told Phillips the surveillance video from the auto parking lot was "a very, very bad piece of evidence against [him], . . . especially when he later on admits that is him in the picture. Okay." (Mar. 22, 2023 Tr. at 27.) At voir dire, the court described the surveillance video as a "smoking gun." (Aug. 14, 2023 Tr. Vol. 1 at 7.) During the court's colloquy with Phillips at trial, the court noted the "video [had been] played [for the jury]. You've got that out there." (Tr. Vol. 3 at 485.) The court also noted Phillips was "scattering around a bit" during his interview with Lt. Retherford and "got double tracked a couple times, [something he couldn't] afford to do . . . on the stand." (Tr. Vol. 3 at 487.) These statements indicated to Phillips the trial judge believed the evidence against him was insurmountable and that Phillips would perform poorly on the stand.

{¶ 102} The majority decision claims "this is not a case in which the defendant had affirmatively asserted his right to testify but then changed his mind because of warnings from the trial court." (Majority Decision at ¶ 36.) I disagree. While it is true Phillips did not utter any magic words expressly stating he wanted to testify, Phillips repeatedly informed the trial court he wanted to "speak," wanted an "opportunity to . . . speak," wanted a chance to "speak and cross-examine somebody," and wanted to "explain [his] side of things." (May 11, 2022 Tr. at 55; July 20, 2022 Tr. at 9-11; Mar. 22, 2023 Tr. at 27-28.) Phillips indicated he understood his opportunity to speak would occur at "trial." (May 11, 2022 Tr. at 55.) Phillips addressed the fact he believed the surveillance video was modified and denied that he was the person depicted on the surveillance video, prompting the trial court to ask if Phillips was "almost going to have to take the stand." (May 11, 2022 Tr. at

67.) After hearing the state's evidence, Phillips was not dissuaded from testifying. Rather, Phillips had specific questions for the court about what would happen when he took the stand. Accordingly, considering the record in the present case, I find Phillips made statements alerting the trial court to his desire to testify. The trial court's subsequent inappropriate comments to Phillips exerted such duress on Phillips so as to preclude him from making a free and voluntary decision whether to testify. Indeed, Phillips *only* expressed a desire not to testify after the trial court's coercive statements.

{¶ 103} The majority also claims the trial court's statements did not impair Philips's ability to knowingly and intelligently waive his right to testify because the "overnight recess afforded Phillips time to confer with his attorney after the trial court's statements and before making the decision whether to testify." (Majority Decision at ¶ 38.) However, there is nothing in the record demonstrating that Phillips did in fact consult with his attorney during the overnight recess. When court convened the following morning, the judge asked defense counsel, "[i]s your client going to testify or do you know yet?" (Tr. Vol. 4 at 501.) Defense counsel responded stating, "Judge, I believe the Court should probably inquire." (Tr. Vol. 4 at 501.) This exchange indicates defense counsel did not know whether his client wanted to testify following the overnight recess. Additionally, the trial court did not call the recess so Phillips could confer with his attorney about the decision to testify; rather, the recess occurred simply because it was the end of the day. *Compare Joelson*, 7 F.3d at 177 (noting that after the trial court discussed the issue of testifying with the defendant, the court told the defendant it would "give [him] five minutes or so to talk with your lawyer and to finalize what you're going to do"); *United States v. Johnson*, 627 F.3d 578, 582-83 (6th Cir. 2010) (acknowledging that, because the court "instructed Johnson to discuss the matter with his attorney during an immediate break in the proceedings," the "additional time given to Johnson to discuss his decision during a recess enabled him to seek advice from his attorney").

{¶ 104} Furthermore, I question whether Phillips's attorney could have said anything during the overnight recess to undo the harm caused by the court's exceedingly coercive statements. *See Vaughn*, 354 Ill.App.3d at 926 (observing that, although the trial court gave the defendant an opportunity to "confer[] with counsel" after the court made comments indicating the defendant should refuse to testify, the opportunity to confer with

counsel "[did] not negate the fact that the judge stepped over the line in his role as neutral decision-maker"). As such, I would not ascribe any significance to the overnight recess.

{¶ 105} The majority also finds the trial court's comments did not amount to plain error because the court repeatedly "emphasized that the choice whether to testify was Phillips's own." (Majority Decision at ¶ 34.) However, the trial court's statements to Phillips were so "excessive" and "egregious that [Phillips's] ability to knowingly and intentionally waive his right to testify was impaired." *Webber* at 552, citing *Joelson* at 178. Accordingly, after the trial court exerted such duress on Phillips's mind as to preclude him from making a free and voluntary choice whether to testify, the court's statements continuing to remind Phillips that the choice whether to testify was his own were meaningless.

{¶ 106} I emphasize that a trial judge may permissibly answer a defendant's questions and inform a defendant they will be subject to rigorous cross-examination should they exercise their right to testify. However, a trial court errs when its statements to the defendant cross the line from permissible explanation to badgering threats designed to intimidate the defendant and drive them from the stand. In the present case, the court's statements to Phillips crossed that line. As such, I find the trial court violated Phillips's constitutional right to testify.

## II. Structural Error

{¶ 107} Typically, courts review constitutional violations for harmless error. *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991). *See Chapman v. California*, 386 U.S. 18, 24 (1967) (holding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"). In *Fulminante* the court explained that most errors, known as "trial error[s]," occur "during the presentation of the case to the jury, and . . . may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante* at 307-08. Crim.R. 52(A) defines harmless error as "[a]ny error, defect, irregularity, or variance which does not affect substantial rights."

{¶ 108} However, another class of errors known as "structural errors" defy analysis by harmless error standards "because they 'affect[] the framework within which the trial

proceeds, rather than simply [being] an error in the trial process itself.' " *State v. Fisher*, 2003-Ohio-2761, ¶ 9, quoting *Fulminante*, 499 U.S. at 309.  Structural errors "permeate 'the entire conduct of the trial from beginning to end' so that the trial cannot " 'reliably serve its function as a vehicle for determination of guilt or innocence.' " *State v. Perry*, 2004-Ohio-297, ¶ 17, quoting *Fulminante* at 309.  "[A] structural error *mandates* a finding of 'per se prejudice.' " (Emphasis in original.)  *Fisher* at ¶ 9.  Thus, when a structural error has been preserved and the issue is raised on direct appeal, the defendant "generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.' " *Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017), quoting *Neder v. United States*, 527 U.S. 1, 7 (1999).  The United State Supreme Court has found an error to be structural, and therefore subject to automatic reversal, in a limited number of cases.  *See Gideon v. Wainwright*, 372 U.S. 335 (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510 (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168 (1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39 (1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275 (1993) (defective reasonable-doubt instruction); *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) (denial of right to counsel of choice).

{¶ 109} In *Weaver*, the Supreme Court addressed the "three broad rationales" for finding an error to be structural.  *Weaver* at 295.  The court explained a constitutional violation amounts to structural error when "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Id.* at 295. This rationale applies to a defendant's right to self-representation because, when exercised, the right " 'usually increases the likelihood of a trial outcome unfavorable to the defendant,' " but the right is "based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Id.* at 295, quoting *McKaskle* at 177, fn. 8.  Thus, because harm is "irrelevant to the basis underlying the right," a violation of the right to self-representation constitutes structural error.  *Id.*  The court also explained an error may be structural "if the effects of the error are simply too hard to measure," such as when a defendant is denied the right to select his or her own attorney, and if "the error always results in fundamental unfairness," such as when a trial "judge fails to give a reasonable-doubt instruction." *Id.* at 295-96.

{¶ 110} In *McCoy* the Supreme Court recognized that, while decisions regarding trial management remain the lawyer's province, the accused has the ultimate authority to decide "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *McCoy*, 584 U.S. at 422. The court found a defendant's "[a]utonomy to decide that the objective of the defense is to assert innocence belongs in this latter category." *Id*. The court noted a defendant's autonomy to decide the objective of their defense is embodied in the Sixth Amendment's provision for the "Assistance of Counsel," because " 'an assistant, however expert, is still an assistant.' " *Id*. at 421, quoting *Faretta*, 422 U.S. at 819-20. The *McCoy* court further found a "[v]iolation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called 'structural,' " because the right is " 'not designed to protect the defendant from erroneous conviction' " but instead exists to protect the " 'fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty.' " *Id*. at 427-28, quoting *Weaver*, 582 U.S. at 295.

{¶ 111} The United States Supreme Court has yet to specifically address whether a violation of the right to testify amounts to structural error. However, at least one Ohio appellate court has observed that "a total prohibition upon the accused's right to testify falls within those structural defects which so taint the process that the trial 'cannot reliably serve its function as a vehicle for the determination of guilt or innocence.' " *State v. Skeens*, 1997 Ohio App. LEXIS 1978, *14 (4th Dist. May 6, 1997), quoting *Fulminante*, 499 U.S. at 310.[6]

{¶ 112} In its brief, the state notes the following courts have applied a harmless error analysis to a violation of a defendant's right to testify: *State v. Nelson*, 2014 WI 70 (2014); *Woolfolk*, 339 S.W.3d 411; *Palmer v. Hendricks*, 592 F.3d 386 (3d Cir. 2010); *People v. Allen*, 44 Cal.4th 843, 871 (2008); *Johnson v. State*, 169 S.W.3d 223, 238 (Tex.Crim.App. 2005). (Appellee's Brief at 12.) Notably, the cases the state relies on were all decided *before* the United States Supreme Court decisions in *Weaver* and *McCoy*. And, nearly all the cases find a violation of the right to testify subject to harmless error review because an appellate

---

[6] In *Skeens*, the defendant informed the trial court he wished to testify *after* both sides had rested and the court brought the jury in for closing arguments. *Id*. at *11-12. The trial court refused to reopen the case to permit the defendant to testify. The appellate court acknowledged that, while the case appeared to involve a deprivation of the defendant's right to testify and therefore appeared "at first blush to constitute a structural defect," because the issue actually "involve[d] reopening the case after both parties had rested," harmless error review was appropriate. *Id*. at *15. *Accord State v. Lute*, 2016-Ohio-7978, ¶ 26, 32 (4th Dist.) (applying *Skeens* to a factually similar scenario).

court can assess the defendant's proffered testimony in the context of the remaining evidence to determine whether the testimony would have affected the outcome of trial. *See Palmer* at 399 (noting the defendant's proffered testimony "can be evaluated in the context of the remainder of the evidence in order to assess the impact of the constitutional violation"); *Nelson* at ¶ 32, quoting *Fulminante*, 499 U.S. at 308 (finding a deprivation of the right to testify subject to harmless error review because "its affect on the jury's verdict can be 'quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt' "); *Allen* at 872 (stating that if the "facts to which a defendant offered to testify would not have affected the verdict, the exclusion of his or her testimony was harmless"); *Johnson* at 237 (concluding "the effect of the error can be quantitatively assessed by looking at the defendant's anticipated testimony, the evidence admitted at trial, the jury charge, and other factors"). *See also Woolfolk* at 419 (finding the trial court's inaccurate perjury advice "did not induce [the defendant's] decision not to testify or otherwise contribute to the verdict obtained," because the accused previously "expressed a preference not to testify unless he had to").

{¶ 113} However, as the court in *Weaver* explained, a violation of a constitutional right amounts to structural error when "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Weaver* at 295. A violation of the right to testify falls in this class of errors. In *Rock* the United States Supreme Court recognized "an accused's right to present his own version of events in his own words" is "[e]ven more fundamental to a personal defense than the right of self-representation." *Rock* at 52. Like the right to self-representation, the right to testify is not designed to protect the defendant from erroneous conviction and, when exercised, both may actually increase the chance of conviction. Indeed, "[a]lthough a defendant who chooses to testify may actually decrease his or her chance of acquittal, nonetheless, 'the wisdom or unwisdom of the defendant's choice does not diminish his right to make it.' " *Boyd v. United States*, 586 A.2d 670, 673 (D.C. 1991), quoting *People v. Curtis*, 681 P.2d 504, 513 (Colo. 1984). *See also State v. Rivera*, 402 S.C. 225, 243 (2013) (recognizing the defendant's testimony may have been "prejudicial to his case," but noting such prejudice "[could not] serve as a basis for the trial court to prevent [the defendant] from taking the stand"); *State v. Dauzart*, 769 So.2d 1206, 1210 (La. 2000) (explaining the accused "has the right to face jurors and address them directly without regard to the probabilities of

success"); *State v. Cantu*, 318 Kan. 759, 776 (2024) (finding it "inappropriate to assess the effect [the violation of the right to testify] had on the outcome of the trial because the error impairs the integrity of the trial, no matter the outcome").[7]

{¶ 114} The right to testify protects a defendant's personal right to decide whether calling himself as a witness and presenting the jury with his side of the story is the best way to protect his own liberty. *Rock*, 483 U.S. at 52; *McCoy*, 584 U.S. at 422. A defendant's desire "to tell 'his side' in a public forum may be of overriding importance to him. Indeed, in some circumstances the defendant, without regard to the risks, may wish to speak from the stand, over the head of judge and jury, to a larger audience." *Wright v. Estelle,* 572 F.2d 1071, 1078 (5th Cir. 1978) (Godbold, J., dissenting). Accordingly, because the right to testify is not result oriented, but rather exists to protect the defendant's autonomy to decide the proper way to protect his or her own liberty, a violation of the right to testify amounts to structural error.

{¶ 115} The court in *Weaver* also noted an error may be structural "if the error always results in fundamental unfairness." *Weaver* at 296. The right to testify in one's own defense is " 'so inherently personal and basic that the fundamental fairness of a criminal trial is called into question if . . . the accused relinquishes [it] in any manner other than by voluntary, knowing and intentional waiver.' " *Boyd*, 586 A.2d at 677, quoting *Curtis*, 681 P.2d at 511. Indeed, when a defendant is deprived of their right to testify "analysis of whether the outcome of the trial would have been different . . . is irrelevant because [the defendant] is prejudiced by his lack of essential due process which render[s] his criminal trial fundamentally unfair." *Cantu*, 318 Kan. at 773. *See also Rivera*, 402 S.C. at 249-50, quoting *Fulminante*, 499 U.S. at 289 (finding a deprivation of the right to testify amounts to structural error because "the right of an accused to testify in his defense is fundamental to the trial process"); *State v. Hampton*, 818 So.2d 720, 729 (La. 2002), quoting *Rock* at 52 (emphasis in original) (internal quotation marks omitted) (noting the language from *Rock* that "spoke of the right to testify as among those rights that '*are essential to due process of law in a fair adversary process. . . .* [U]nmistakably places the defendant's right to testify

---

[7] In *Wright v. Estelle*, 572 F.2d 1071 (5th Cir. 1978), Judge Godbold acknowledged that "[t]o apply such an outcome-determinative analysis [to a deprivation of the right to testify] at worst denigrates the position of the individual with respect to his own defense and trial and at best exhibits an unthinking paternalism toward criminal defendants." *Id*. at 1082 (J. Godbold, dissenting).

among those protections without which a criminal trial is 'structurally flawed"). Accordingly, because a violation of a defendant's right to testify deprives the defendant of a fundamentally fair criminal trial, the error amounts to structural error.

{¶ 116} Based on the foregoing, I find that when, as in the present case, a trial court prevents a defendant from making a free and voluntary choice whether to testify, the court violates the defendant's right to testify and commits structural error.

### III. Plain Error

{¶ 117} I agree with the majority that an unobjected to structural error is subject to plain error review. *See State v. West*, 2022-Ohio-1556, ¶ 28 (noting "assertions of structural error do not preclude an appellate court from applying the plain-error standard when the accused has failed to object"); *State v. Bond*, 2022-Ohio-4150, ¶ 17 (acknowledging *West* established "that a plain-error analysis is still necessary when the party asserting a structural error did not object to that error in the trial court"); *Perry*, 2004-Ohio-297, at ¶ 23. Because defense counsel did not object to the trial court's inappropriate remarks in the present case, we must review the matter for plain error. Unlike the majority, however, I find the error in the present case amounts to plain error.

{¶ 118} Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Generally, a court will find plain error only when (1) there was an error, (2) the error was plain, i.e., obvious, and (3) the error affected substantial rights. *State v. Tench*, 2018-Ohio-5205, ¶ 217, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). The Supreme Court of Ohio has generally interpreted the third prong of the analysis "to mean that the trial court's error must have affected the outcome of the trial." *Barnes* at 27. "[E]ven if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it;" rather, courts should notice plain errors "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." (Internal quotation marks omitted.) *State v. Rogers*, 2015-Ohio-2459, ¶ 23, quoting *Barnes* at 27, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 119} In *West* a plurality of the Supreme Court applied the plain error standard to an unobjected-to constitutional error. *West* at ¶ 3. The plurality determined that, even

assuming the trial court plainly erred, the defendant could not establish a reasonable probability the error affected the outcome because the "evidence of guilt was overwhelming." *West* at ¶ 29-30. The plurality acknowledged "there may be situations in which a structural error so affects the fairness of a judicial proceeding that reversal is warranted despite the failure to preserve the error," but concluded that *West* was "not such a case." *Id*. at ¶ 35.

{¶ 120} *Bond* began "where *West* left off" and analyzed the "extent to which the existence of structural error is relevant to [the plain error] analysis." *Bond* at ¶ 10. The court initially observed that, when a "recognized structural error has occurred, that error is certainly plain." *Id*. at ¶ 19. The court further acknowledged that, although its previous decisions concluded an error affects substantial rights when the error affects the outcome of trial, such language "[did] not appear in [Crim.R. 52(B)] itself." *Id*. at ¶ 25. The *Bond* court noted the rationales for structural error set forth in *Weaver* "demonstrate[d] why the outcome-determination analysis is not the only sufficient metric by which to measure a structural error." *Id*. at ¶ 26. For instance, "[i]f 'harm is irrelevant to the basis underlying the right,' . . . then harm cannot be the measure of the denial of that right." *Id*. at ¶ 30, quoting *Weaver* at 295. As such, *Bond* determined that "a structural error may affect substantial rights even if the defendant cannot show that the outcome of the trial would have been different had the error not occurred." *Id*. at ¶ 32. The court cautioned it was not "hold[ing] that prejudice will be presumed in such cases," but explained there was "room in plain-error review to recognize the unique nature and fundamental import of established structural errors." *Id*. at ¶ 34.

{¶ 121} *Bond* concerned a courtroom closure that violated the defendant's right to a public trial. A public trial violation is a recognized structural error. *Id*. at ¶ 16. The court noted that even if it assumed the public trial violation affected the defendant's substantial rights, "[t]he final consideration in the plain-error analysis is whether correcting the error is required to prevent a manifest miscarriage of justice or whether the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. at ¶ 35. *See United States v. Olano*, 507 U.S. 725, 736 (1993), quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936) (stating courts of appeals should "correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation

of judicial proceedings' "). The courtroom closure in *Bond* was "partial," it occurred "during the state's presentation of evidence, after an eyewitness finished testifying," the court permitted "Bond's immediate family members and the victim's immediate family members to attend the remainder of the trial," and Bond "ha[d] not asserted that any harm resulted from the closure." *Bond* at ¶ 37. As such, the court found the public trial violation in *Bond* did not "so affect[] the fairness of the proceeding as to require correction." *Id*.

{¶ 122} In the present case, the violation of Phillips's right to testify amounted to structural error. As such, the error was plain. *Id*. at ¶ 19. Because the error was structural, Phillips was not required to show the outcome of trial would have been different but for the error. *Id*. at ¶ 33. Rather, by depriving Phillips of his right to testify, the court deprived Phillips of a fundamentally fair trial and thereby affected Phillips's substantial rights.

{¶ 123} Because the right to testify in one's own defense is fundamental to the integrity of a criminal trial, ignoring a violation of the right necessarily results in a manifest miscarriage of justice. Unlike the violation of the defendant's right to a public trial in *Bond*, the present case does not involve a partial violation of Phillips's right to testify.[8] Rather, the trial court's coercive statements completely deprived Phillips of the ability to make a free and voluntary decision regarding his right to testify. Finally, the judge's coercive statements in the present case, especially the statement informing Phillips he would be "take[n] . . . down the road" and "chop[ped] . . . up" if he testified, certainly affected the fairness of the proceeding and the public reputation of judicial proceedings. (Tr. Vol. 3 at 484-85.)

{¶ 124} Accordingly, I find the deprivation of Phillips's right to testify in the present case amounted to plain error. Because the majority declines to do so, I respectfully dissent.

---

[8] *Compare Cantu*, 318 Kan. at 773 (observing that, if the trial judge had "only removed Cantu from the stand" when he became disruptive during cross-examination "without striking his direct testimony, his right to testify would have been partially denied by foreclosure of further testimony on cross-examination and redirect[;]" but by "removing Cantu from the stand and then striking his entire testimony," the court's actions resulted in a "complete denial of his right to testify").